NORTH SHORE–CHICAGO
REHABILITATION
INC., Plaintiff,

v.

VILLAGE OF SKOKIE, Defendant.

No. 93 C 1198.

United States District Court,
N.D. Illinois, E.D.

July 9, 1993.

---

Timothy Frank Kocian, Jonathan D. Sherman, Katz, Randall & Weinberg, Chicago, IL, for plaintiff.

Mark Stein, Barbara M. Meyer, Village of Skokie, Skokie, IL, Patrick A. Lucansky, Klein, Thorpe & Jenkins, Ltd., Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff North Shore–Chicago Rehabilitation, Inc. ("North Shore") brings this action against the Village of Skokie, challenging certain provisions of its local zoning ordinance pursuant to the 1988 amendments to the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* North Shore is an Illinois corporation that intends to provide a therapeutic program for traumatically brain injured adults. On May 20, 1993, Magistrate Judge Elaine E. Bucklo filed and served upon the parties her Report and Recommendation concerning North Shore's motion for a preliminary injunction. After conducting an evidentiary

hearing (at which six witnesses testified for North Shore and three for Skokie), and considering various affidavits filed on behalf of North Shore, a videotape of a Skokie Village board meeting, and the briefs filed by the parties as well as that filed by the United States as amicus curiae, Magistrate Judge Bucklo recommended that the motion be granted and an order entered prohibiting Skokie from "delay[ing] or refus[ing] any permit, including the occupancy permit, on the grounds that its zoning ordinance does not permit the proposed North Shore facility." Report and Recommendation at 23–24. The Village of Skokie objects to the Magistrate Judge's Report and Recommendation, contending (1) Magistrate Judge Bucklo improperly denied Skokie's pre-hearing, oral motion for disclosure and depositions of North Shore's proposed witnesses, and (2) Magistrate Judge Bucklo erroneously assessed North Shore's likelihood of success on the merits as Skokie did not intentionally discriminate against North Shore in its application of its local zoning ordinance nor caused a discrimination impact. As explained below, we overrule Skokie's objections to Magistrate Judge Bucklo's Report and Recommendation, and grant North Shore's motion for preliminary injunction.

◼ As a nondispositive, pre-trial matter, we review Magistrate Judge Bucklo's denial of the motion for disclosure and depositions under the "clearly erroneous or contrary to law" standard of 28 U.S.C. § 636(b)(1)(A), as implemented by Fed. R.Civ.P. 72(a). *See Bobkoski v. Board of Educ.,* 141 F.R.D. 88, 90 (N.D.Ill.1992). Skokie's motion, filed six days prior to the evidentiary hearing, sought an order compelling North Shore to identify and produce for deposition up to three "medical persons" expected to testify on its behalf. Given the timing of Skokie's motion and the availability of an opportunity to cross-examine these witnesses during the evidentiary hearing, we are not left with "the definite and firm conviction" that the Magistrate Judge improperly denied Skokie's discovery request. *See United States v. United States Gypsum,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948) ("A finding is 'clearly erroneous' when although there is evidence to support it, the

reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.").

◼ As Magistrate Judge Bucklo aptly observed, in order to demonstrate a likelihood of success, North Shore must proffer evidence tending to establish that either (1) Skokie's actions were motivated by an intent to discriminate against North Shore's proposed residents on the basis of a handicap, or (2) Skokie's conduct produced a discriminatory effect, even though it was taken without discriminatory intent. Report and Recommendation at 15 (citing *United States v. Borough of Audubon,* 797 F.Supp. 353, 359 (D.N.J.1991), *aff'd mem.,* 968 F.2d 14 (3d Cir.1992)); *see also Doe v. City of Butler,* 892 F.2d 315, 323 (3d Cir.1989); *Oxford House–Evergreen v. City of Plainfield,* 769 F.Supp. 1329, 1343 (D.N.J.1991); *Baxter v. City of Belleville, Ill.,* 720 F.Supp. 720, 732 (S.D.Ill. 1989). At the heart of Magistrate Judge Bucklo's recommendation stands her finding that North Shore has demonstrated a reasonable likelihood that Skokie's enforcement of its zoning ordinance had a discriminatory effect on the handicapped persons North Shore intends to serve, in violation of the reasonable accommodation requirement of the Fair Housing Act. Over Skokie's objections, we adopt this finding.

Section 804(f)(3)(B) of the Fair Housing Act, as amended, makes it unlawful for municipalities such as Skokie to fail to make "reasonable accommodations in rules, policies, practices or services ... necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). "Reasonable accommodation" has been defined as "changing some rule that is generally applicable so as to make its burden less onerous on the handicapped individual." *Oxford House, Inc. v. Township of Cherry Hill,* 799 F.Supp. 450, 462 n. 25 (D.N.J.1992). Under this analysis, similar to that in Title VII cases, North Shore can establish a *prima facie* case by showing that Skokie's action had a greater adverse impact on the instant group of handicapped persons than on others, regardless of intent. *See id.* at 461. Once North Shore

establishes a *prima facie* case, the burden shifts to Skokie to demonstrate some legitimate, nondiscriminatory reason for their action, and that no less discriminatory alternatives are available. *Id.*

In the instant case, North Shore has established a *prima facie* case of disparate impact. We concur in Magistrate Judge Bucklo's determination, and Skokie does not dispute, that

> a facility such as North Shore's is needed, that brain-injured persons would have a much better chance for a successful rehabilitation if they could spend time in a facility such as the one North Shore proposes, and that the Karlov Street location is important because it is in a quiet neighborhood yet located near transportation and other public services.

Report and Recommendation at 17. Section 4.2.176 of Skokie's zoning ordinance defines a "group home"[1] as follows:

> DWELLING; GROUP HOME: A single dwelling unit with five (5) or less bedrooms occupied on a permanent basis by a group of unrelated persons with handicaps, plus paid professional support staff provided by a sponsoring agency, either living with the residents on a 24 hour basis, or available in accordance with the particular needs of the residents; is state licensed; has obtained an Administrative Occupancy Permit from the Village of Skokie; complies with all applicable State and Village codes, regulations and ordinances, and with the zoning regulations for the district in which the site is located.

Claiming that the proposed facility failed to meet the requirements of the above provision, Skokie refused to process North Shore's application for an Administrative Occupancy Permit. At the time of its refusal to process the application, Skokie seemingly based its decision on North Shore's failure to demonstrate "that they have obtained or are eligible for a State License or Certification." Letter from Wayne C. Hanson, Director of Zoning for the Village of Skokie, to Gary Auerbach (Jan. 20, 1993) (attached to North Shore's Complaint as Exhibit 3). Presently, Skokie also claims that it refused to process the application because the residents are not expected to live in the home on a permanent basis. It is evident that Skokie's interpretation of its "Group Home Ordinance" imposes more stringent requirements on groups such as brain-injured individuals than on other groups eligible for a "group home" permit.

In response, Skokie has failed to present evidence establishing a legitimate, nondiscriminatory reason for its action, and that a reasonable accommodation was impossible. Skokie's justification for the state licensing requirement arises out of its concern for the welfare of the residents of the proposed facility. There is no doubt that the state is better equipped to maintain oversight agencies to assure proper care of persons in rehabilitation facilities than is Skokie. To this extent, as a general matter, local municipalities should be free in forming their zoning ordinances to require that certain rehabilitation facilities obtain available state certification or licensing. Indeed, other courts have upheld as reasonable similar restrictions in local zoning ordinances designed to foster the general welfare and safety of residents of such rehabilitation facilities. *See Elliott v. City of Athens*, 960 F.2d 975, 983 (11th Cir.) (restriction regarding the maximum number of occupants permitted to occupy a dwelling reasonable under the circumstances of the case and, thus, § 3607(b)(1) exemption applies), *cert. denied*, —— U.S. ——, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992); *Familystyle of St. Paul, Inc. v. City of St. Paul*, 728 F.Supp. 1396, 1404–05 (D.Minn. 1990) (restriction that a new group home be located at least 1320 feet from an existing

---

1. We observe that it is irrelevant to our present inquiry whether the North Shore facility can be defined as a "group home" or, as Skokie now contends, as a "halfway house." North Shore applied for a permit to operate its facility at the Karlov street location, and Skokie refused to process the application on the grounds of its "Group Home Ordinance." Our inquiry as to whether this ordinance makes reasonable accommodation for North Shore follows from Skokie's application of its requirements, not on a determination that the facility is in fact a "group home" as defined by Skokie. Indeed, the gist of North Shore's suit is not that Skokie has misinterpreted its definition of a "group home," but rather that the definition is discriminatory in that it excludes the instant group of brain-injured persons.

residential program held reasonable in light of concern over the potential "ghettoization" of the mentally ill), *aff'd*, 923 F.2d 91 (8th Cir.1991). In the instant case, however, the two restrictions seized upon by Skokie bear no rational relationship to the general welfare or safety of the proposed North Shore residents.

In anticipation of its application for an Administrative Occupancy Permit, North Shore contacted the two state agencies responsible for the issuance of licenses for residential rehabilitation programs: (1) the Illinois Department of Mental Health and Developmental Disabilities, which administers the Community Residential Alternatives Licensing Act and the Community–Integrated Living Arrangements Licensure and Certification Act; and (2) the Illinois Department of Public Health, Division of Long Term Care Quality Assurance, which administers the Nursing Home Care Act and the Community Living Facilities Act. It is undisputed that the State of Illinois does not license or certify operators of non-nursing home providers of services for traumatically brain-injured adults. Thus, based on North Shore's representations concerning the function of its home, both state agencies advised North Shore that it did not need a license to operate. We, like Magistrate Judge Bucklo, conclude that any justification for the licensing requirement on the basis of concerns over welfare and safety is inadequate where, as here, the state does not license the particular type of group living facility for the handicapped. This conclusion should be of no surprise to Skokie. Indeed, since August of 1990, it has been the position of the Illinois Planning Council, the body whose recommendations Skokie relied upon in its attempt to bring its zoning ordinances in compliance with the 1988 amendments to the Fair Housing Act, that:

> While it is impossible in Illinois to open a group home for people who have developmental disabilities or mental disabilities without a state license, there have been group homes in some states for people with disabilities that do not fall within these two categories. If a zoning ordinance defines a group home as being licensed or certified, it totally excludes group homes for persons with these other disabilities[,] a discriminatory act under the Fair Housing amendments of 1988.

Plaintiff's Exhibit 7, at 2. This statement appeared in a newsletter drafted by Daniel Lauber, who testified as an expert witness on behalf of Skokie at the evidentiary hearing. Notably, Lauber testified that he specifically informed Skokie that, in this regard, its zoning ordinance violated the 1988 amendments to the Fair Housing Act, but Skokie refused to amend the ordinance. *See* Letter from Daniel Lauber to Robert Molumby, Director Department of Planning for the Village of Skokie (Aug. 20, 1990).

Further, we hold that Skokie did not meet its burden of establishing that no less restrictive alternative was available or that no reasonable accommodation could be made. Indeed, in lieu of state licensing, North Shore has offered to seek certification from the Committee on Accreditation of Rehabilitation Facilities ("CARF"), a highly respected organization with high standards for accreditation. Skokie does not assail CARF's reputation. Instead Skokie contends that CARF's six-month requirement for accreditation renders this alternative unreasonable. We, like Magistrate Judge Bucklo, disagree.

■ Likewise, Skokie has set forth no legitimate, nondiscriminatory justification respecting the requirement that the facility be "occupied on a permanent basis." At the threshold, we observe that Skokie's failure to raise this concern until these proceedings, as opposed to informing North Shore of its concern at the time it refused to process its application, belies the genuineness of Skokie's interest. In any event, Skokie claims that requiring each resident to reside in the home on a permanent basis is grounded in its concern for the other residents of the community. As poignantly observed by the Magistrate Judge:

> Skokie has not defined "permanent" and it does not require that families who occupy a single family residence agree that they will stay "permanently." There is also no requirement that residency be "permanent" in "community live-in residences," which differ from group homes principally

in the number of bedrooms. Thus, while long term residency undoubtedly promotes values important to a community, Skokie has failed to offer any reason why residents of a group home such as North Shore's must meet the requirement (or even show what it means; is a year, for example, "permanent?"), when no other residents in R–1 zoned areas are required to do so.

Report and Recommendation at 19. Under these circumstances, we agree with Magistrate Judge Bucklo that "North Shore is also likely to be able to prove that the requirement of permanency as applied to the proposed residents of North Shore's facility fails to make a reasonable accommodation for their handicap." *Id.*

In sum, we conclude that North Shore has demonstrated a reasonable likelihood that Skokie's enforcement of its zoning ordinance had a discriminatory effect on the handicapped persons North Shore intends to serve, in violation of the reasonable accommodation requirement of the Fair Housing Act.[2] Accordingly, we adopt Magistrate Judge Bucklo's Report and Recommendation, overrule Skokie's objections thereto, and grant North Shore's motion for a preliminary injunction. Skokie is hereby enjoined from delaying or refusing any permit, including the occupancy permit, on the ground that its zoning ordinance does not permit the proposed North Shore facility. It is so ordered.

## *REPORT AND RECOMMENDATION*

BUCKLO, United States Magistrate Judge.

Plaintiff North Shore–Chicago Rehabilitation, Inc. ("North Shore") seeks a preliminary injunction preventing defendant Village of Skokie ("Skokie") from enforcing a zoning ordinance or taking any other action to prevent North Shore from operating a home for handicapped individuals at a location leased by North Shore in Skokie. North Shore asks, in addition, for an order requiring Skokie to issue an Administrative Occupancy

Permit to North Shore for its home. North Shore's action is brought pursuant to the Fair Housing Act as amended in 1988, 42 U.S.C. § 3601 *et seq.* This court has jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 3613. North Shore submitted affidavits and a videotape of a Skokie Village board meeting in support of its motion. I also heard testimony and have considered the briefs filed by the parties as well as by the United States, as amicus curiae. For the reasons that follow, I recommend that a preliminary injunction be granted.

### *Findings of Fact*

North Shore is an Illinois corporation that intends to provide a therapeutic program for traumatically brain injured adults. The purpose of the program is to reintegrate these people into the community both vocationally and socially. Part of the program is to provide residential housing to assist these persons in being restored to independent living. North Shore intends that the persons living together will function as a family, sharing responsibility for meal preparation and cleaning, and participating in recreational activities.

North Shore has leased a residential home at 9335 North Karlov in Skokie. The home is owned by James A. Young, M.D., who is also president of the executive board of North Shore. The area in which the home is located is zoned R–1, a single family dwelling district under Skokie's zoning ordinance. North Shore intends to use the dwelling as a residence for up to eight individuals in its rehabilitation program. Each of the persons who will live at the home has some physical or mental impairment associated with his or her brain injury that substantially limits one or more life activities.

Dr. Young testified that people may become brain injured through motor vehicle accidents, near drowning, strangulation, or the rupture of a blood vessel, and that a brain injury is a lifetime disability. He testi-

---

**2.** In light of our determination regarding the disparate impact of Skokie's zoning ordinance, we need not address the contested issue of whether North Shore has demonstrated a rea-

sonable likelihood that Skokie's refusal to allow it to open its home stemmed from a discriminatory intent.

fied that brain injured persons are almost always initially hospitalized until the injury is stabilized. Often they are then transferred to an acute rehabilitation facility. They may then go back to their homes and become outpatients in a hospital, or take part in a "day hospital," or move to a residential setting apart from their own home. Dr. Young, who is a board certified neurologist, testified that a day treatment program works well for only a small number of patients. He stated that a patient at this stage of recovery is far from normal, that families often do not know how to cope with the brain injured person, and that the rehabilitation outcome is much less successful when a patient returns home at night than in a 24–hour residential group home. Dr. Young explained that brain injured persons have many problems. For example, they may have lost the ability to understand the subtleties of conversation or their visual perception may be off. While the effects of brain injury vary widely, they may include impairment of auditory or speech function, concentration and comprehension, and may involve epilepsy. They may have trouble making decisions. Dr. Young testified that in order for such persons to be able to return successfully to independent living and working, they have to relearn basic skills. Dr. Young also testified that last year there were 9,000 head injuries in Illinois, and that 90 percent of these individuals suffered brain injuries.

Dr. Young also testified regarding the proposed facility. He stated that only persons who met a neurological standard of "Rancho 5" or better would be allowed to live in the home. A "Rancho 5" level of recovery means that the patient is still confused but is non-agitated. (A level 6 rating means the person is still confused, and may react inappropriately, for instance laughing or crying at odd times. At level 7, the person is better, though still confused. At level 8, the person is not confused, and acts appropriately.) The home would be staffed 24 hours a day with a psychologist and para-professionals. The group home, according to Dr. Young, would facilitate recovery in several ways. First, the persons living there would be required to live and work with others in such activities as cooking, cleaning and planning recreational activities. They would have regular group discussions regarding not only the home interaction, but also problems encountered at work. A group counsellor or "job coach" would accompany each person to work (they would obtain career counselling and return either to a former job or attempt to find a new one) and other counsellors would accompany residents at other times. Dr. Young explained that most residents (who would be paying $500.00 a day) come from residential settings like Karlov Street, and the similar atmosphere helps in their recovery. The Karlov location would also be helpful because residents can easily go places such as the park, a movie, or the store. Dr. Young testified that he expected persons to live in the Karlov home from three to 18 months.

Other witnesses supported Dr. Young's testimony regarding the need for group homes such as North Shore's proposed home. Dr. Valerie Ito, director of the brain injured program at the Rehabilitation Institute of Chicago, testified that often persons are ready to leave places such as the Rehabilitation Institute but are not ready to go home. At a group home they can relearn skills such as taking a bus or going shopping, participate in vocational training and finally, begin employment or begin volunteer work. She testified that many people at the stage at which they would go to North Shore need supervision. She testified that if North Shore was in operation she would refer patients there. She also testified that North Shore's proposed facility is not a nursing home, which is a place where people are fed meals prepared by staff, and given medical care.

Dr. Jeri Morris, a psychologist specializing in neuro-psychology, who treats brain injured people and is on the faculty of the Rehabilitation Institute and Northwestern University Medical School, also testified that a transitional facility such as North Shore's would benefit brain injured persons because they could practice, under supervision, the life skills they need to become reintegrated in society.

Dr. Kevin Hartigan, a psychologist, is the vice president and clinical psychologist for

North Shore and would be responsible for the clinical program at the facility. Dr. Hartigan testified that the group home would provide a community in which people could live and practice social and vocational skills, under 24–hour supervision. He also testified that in his experience, the effect on family members of a brain injury is traumatic and negative, and that allowing the injured person to recover in a group home not only directly helps the injured person but allows the family a better chance at a successful restoration. Dr. Hartigan testified that the group home, with assigned tasks, encouragement in participation in games, etc., will help persons improve concentration and memory. He stated that the atmosphere would lessen the ability of the injured person to simply sit and "vegetate" as often happens when the person returns to his own home prematurely, because the person will have responsibilities to others. The group home, according to Dr. Hartigan, will also help brain injured persons restore the complex nature of cause and effect relationships through practice and discussion, enabling them to cope better with social and work relationships. Dr. Hartigan testified that while clinical competence is more important than where the facility is located, the home setting is important in that a quiet, attractive place will help brain injured persons not to become overstimulated, and will provide a familiar environment to persons who are likely to have come from similar environments before their injuries.

Marvel Joy Vena, the incoming president of the Illinois Head Injury Foundation, who suffered a brain injury in 1979 as a result of a vehicle accident, testified that group support from other brain injured persons is important because outsiders do not fully understand what brain injured persons are going through. She also testified that her foundation gets many requests for referrals to residential facilities from family members.

Dr. Elizer Schwartz, a psychologist, testified on behalf of Skokie. Dr. Schwartz agreed with Dr. Young and the other witnesses that a transitional facility such as planned by North Shore would benefit brain injured persons, giving them a better chance to return to independent living. Dr. Schwartz stated that he would like to refer patients of his own to the North Shore facility.

Skokie's zoning ordinance permits in an R–1 zoned district, in addition to single families (a family is defined as not more than four unrelated persons), "group homes," "community live-in residences," hospitals, schools, colleges and universities, churches, convents and monasteries.

Skokie defines a "group home" as "a single dwelling unit with five (5) or less bedrooms, occupied on a permanent basis by a group of unrelated persons with handicaps, plus paid professional support staff ... is state licensed...." The definition further requires a "group home" to have obtained an Administrative Occupancy Permit. To obtain such a permit, the applicant must show that it has "obtained or ... [is] eligible for state licensing or certification to operate the proposed group home" and demonstrate that the facility will not be located closer than one block or 600 feet of another such facility in R–1 districts.[1]

A "community live-in residence" is defined by Skokie as a dwelling unit containing six or more bedrooms, or a building with two or more dwelling units, "or two (2) or more buildings, operated by a single sponsoring agency, occupied by a group of unrelated adults with handicaps, utilizing common paid professional support staff, operating as a single state licensed facility and in which supervision and/or services are provided in accordance with particular needs in a home-like setting...."

On January 11, 1993, North Shore applied for an Administrative Occupancy Permit for the home that it wants to operate in Skokie. Prior to submitting its application for an occupancy permit, North Shore had been advised by the Illinois Department of Mental Health & Developmental Disabilities ("DMH") that it did not need a license under either act administered by the DMH (the

---

1. An applicant that does not meet the distance criteria may apply for a variance under the ordinance. Neither party to this case alleges that there is any other facility that would be close to North Shore's proposed home. Distance is therefore not an issue in this case.

Community Residential Alternatives Licensing Act and the Community Living Arrangements Licensure and Certification Act) to operate its facility. North Shore had also been told by the Illinois Department of Public Health, Division of Long Term Care Quality Assurance ("DPH"), that its home did not need a license under the Nursing Home Care Act or the Community Living Facilities Act. When North Shore applied for the occupancy permit required by Skokie, it included the letters received from the DMH and DPH indicating that North Shore did not need to be licensed by the state.

At a public hearing of the Village Board of Skokie on January 18, 1993, various residents of the 9300 block on Karlov Street objected to North Shore's proposed home. According to a statement read at the hearing by a Chris Johnston, who stated he was a resident of the block and a psychologist, the 9300 block of Karlov is an ideal (he described it as a "treasure") street on which families come to raise their children and stay for the rest of their lives. Mr. Johnston, speaking on behalf of other residents who were also at the hearing, stated that there is a small park near the block, there is "easy access" to public transportation, public services are excellent, the street is quiet, there is little traffic, little if any crime, and residents are "connected, but lead independent, divergent lives." Mr. Johnston stated that he and the other residents were at the hearing because this ideal living environment was about to be changed "drastically," leaving the residents with a "sense of helplessness and outrage." The cause of the expected "drastic" change was the proposed North Shore home. According to Mr. Johnston, the residents fear their children will be psychologically harmed by seeing the North Shore's residents because brain injured persons might have seizures and lose "control" of their bodies, and because some of the brain injured persons might not look "like anyone else." Mr. Johnston also expressed concern about how the residents of the North Shore facility will feel "as children shun them as potentially dangerous strangers in their community." Mr.

Johnston stated that the residents also fear that property values will go down, that supervision in the facility will be inadequate, and that, since the facility would be staffed 24 hours a day, more cars might need parking places than could be provided by the facility without taking up space on the street.

In response to Mr. Johnston's statement, and several comments made by other residents of the block who were not identified on the videotape of the hearing submitted in evidence, who also voiced concern about the mental health of children who might see the residents of North Shore's facility, Skokie's mayor and corporation counsel both stated that the corporation counsel had examined the application and because it stated that North Shore had been advised that it did not need, and thus could not get a state license, and Skokie's ordinance requires a state license as a pre-condition to receiving an occupancy permit, North Shore would not be able to obtain an occupancy permit. The city officials did state, in response to questions from residents, that if North Shore did obtain a state license it would have to process the application and that if the facility met all of the requirements, it would have to issue an occupancy permit.[2] The mayor also stated that Skokie officials "are a little bit constrained" by the Federal Housing Act and that there was "not much that we can do" about North Shore's plans apart from what they were doing. Subsequently, on January 20, 1993, Skokie officially informed North Shore that it would not issue the permit because North Shore had not obtained or shown that it was eligible to obtain a state license or certification.

At the evidentiary hearing, Wayne Hanson, Director of Building and Zoning for Skokie, testified that he is responsible for issuing administrative occupancy permits. He testified that prior to the time he denied North Shore's application, he had received telephone calls from citizens inquiring about the North Shore permit. He stated that he did not hear that residents of the block opposed the permit until after the Village board

---

2. The mayor indicated that if Skokie was required to process the application because the facility obtained a state license it would require North Shore to strictly comply with all permit requirements.

meeting, when he read about the meeting in the local newspaper. Having watched the videotape of the board meeting at which citizens voiced their complaints, I find this testimony hard to believe. Although Mr. Johnston read his statement during a portion of the meeting reserved for public comments, and the North Shore facility had not otherwise been a subject of discussion on the agenda of the board meeting, it was clear that the mayor and corporation counsel were prepared for the discussion at the time it arose. Since they appeared to know about the opposition before the meeting, it is likely that Mr. Hanson did also.

North Shore's attorney met with Skokie officials on January 27, 1993. At that time, Skokie's corporation counsel informed North Shore that its alternatives were to obtain a state license or petition the Skokie Plan Commission to amend the zoning ordinance. The following day, North Shore informed Skokie officials that it would obtain accreditation by the Committee on Accreditation of Rehabilitation Facilities ("CARF"). North Shore represents that CARF is sponsored by various national health organizations for the purpose of accrediting facilities that provide services to persons with disabilities. At the evidentiary hearing on the motion, various witnesses testified that CARF is a respected organization with high standards for accreditation. Dr. Morris also testified that in her opinion, based on the description of the facility and her knowledge of the persons who will be involved in managing it, North Shore will be able to obtain CARF accreditation. (CARF accreditation is unavailable until a facility has been in operation six months.) Skokie still refused to issue North Shore an occupancy permit. On January 29, 1993, North Shore asked that Skokie inform it of any state licensing authority that Skokie believed was appropriate to North Shore's proposed facility. Skokie responded that it did not know of any. North Shore met with Skokie's mayor on February 18, 1993, in a further attempt to work out an agreement. No agreement was reached.

At the evidentiary hearing, Daniel Lauber, a zoning attorney and chairperson of the American Bar Association's subcommittee on group homes, as well as a past president of the American Planning Association, testified on behalf of Skokie. Notably, however, on cross examination he testified that he was the author of plaintiff's exhibit 7, a newsletter informing communities on how to comply with the 1988 amendments to the Fair Housing Act, and agreed, as stated in the newsletter, that a community ordinance that requires state licensing for the establishment of a group home, if no such licensing is available, violates the 1988 Fair Housing Act. He also testified that he had informed Skokie specifically at some point that its ordinance violated the Fair Housing Act, but that Skokie stated it would not amend its ordinance.

North Shore has been contacted by representatives of several individuals who desire to reside in North Shore's Skokie home. North Shore represents that it is also expending amounts for rent, salaries and administrative expenses with no offsetting income due to Skokie's refusal to issue it an occupancy permit.

North Shore filed its complaint in this case on February 25, 1993, alleging that Skokie's refusal to grant it an occupancy permit is in violation of plaintiff's rights under the Fair Housing Act, as amended, which prohibits discrimination against persons with disabilities, 42 U.S.C. § 3601 *et seq.*

### Conclusions of Law

In general, in order to obtain a preliminary injunction, a plaintiff must show that he has some likelihood of success on the merits, that he has no adequate remedy at law and will suffer irreparable injury if an injunction is not granted, that the harm he will suffer in the absence of an injunction is greater than the harm the defendant will suffer if the injunction is granted, and that the public interest will not be harmed by the grant of an injunction. *E.g., Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380 (7th Cir. 1984).

#### a. Likelihood of Success

Section 3604(f)(1) of the Fair Housing Act makes it unlawful:

[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a

dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter;

(B) a person residing or intending to reside in that dwelling after it is so sold, rented, or made available; or

(C) any person associated with that buyer or renter.

■ The Fair Housing Act defines "handicap" as "a physical or mental impairment which substantially limits one or more of such person's major life activities...." 42 U.S.C. § 3602(h)(1). As North Shore has defined the persons it intends to serve, since they suffer a physical or mental impairment that substantially limits one or more of their life activities, they are handicapped individuals under the Act. Skokie has not argued otherwise.[3]

The next issue is whether Skokie has discriminated on the basis of handicap. North Shore may prove discrimination either by showing discriminatory intent or effect. *E.g., United States v. Borough of Audubon, N.J.,* 797 F.Supp. 353, 359 (D.N.J.1991). With respect to intent, the evidence in the record before me indicates that North Shore had been advised that its ordinance violated the Fair Housing Act because it failed to make adequate provision for some handicapped individuals, but chose not to change its law. There is, however, no evidence that Skokie had this or any other particular group in mind when it declined to change its ordinance. The statements at the Village board meeting by residents who would be North Shore's neighbors indicated clearly stereotypical ideas about the handicapped, indeed, exactly the kind of bias at which the Act was

aimed.[4] *See* discussion *infra.* If Skokie decided not to issue the occupancy permit because of the expressed bias of residents, intentional discrimination would be shown. *United States v. Borough of Audubon, N.J.,* 797 F.Supp. 353, 361 (D.N.J.1991), *aff'd mem.,* 968 F.2d 14 (3d Cir.1992) ("Discriminatory intent may be established where animus towards a protected group is a significant factor in the community opposition to which the commissioners are responding."). The fact that residents had telephoned the Skokie official in charge of issuing the occupancy permit, and may well have told him how they felt, leaves open the possibility that the decision was based on neighborhood opposition to handicapped individuals. The comments of Skokie's mayor at the board meeting regarding the "constraint" felt by Skokie officials due to the Federal Housing Act and her statement that there was "not much that we can do" could also be interpreted as indicating that Skokie was influenced in its action by neighborhood opposition. On the other hand, the remarks of Skokie's mayor may have been intended only to remind the citizens that, whatever they may think, federal law in fact provides a limitation on the decisions that a municipality can make in terms of zoning and housing. The response of Skokie officials to the application was also in strict compliance with the language of the ordinance.

I conclude that the present record shows evidence of neighborhood animus toward handicapped individuals and shows, as well, that Skokie officials knew of that bias at the time they turned down North Shore's application. Whether Skokie would have made

---

**3.** Skokie has also not disputed North Shore's standing to assert the present claim on behalf of the clients it proposes to serve. Under the Act, it is clear that North Shore does have standing to bring this action. 42 U.S.C. § 3604(f)(2)(B). *Horizon House Developmental Services, Inc. v. Township of Upper Southampton,* 804 F.Supp. 683, 692 (E.D.Pa.1992); *Baxter v. City of Belleville,* 720 F.Supp. 720, 727–31 (S.D.Ill.1989). Skokie has argued that North Shore may not have exhausted its administrative remedies, stating that North Shore may seek a change in the zoning ordinance. North Shore is not required to attempt to change the law that Skokie has held prevents it from opening its home before bringing this action. *E.g., Easter Seal Society of New*

*Jersey, Inc. v. Township of North Bergen,* 798 F.Supp. 228, 236 (D.N.J.1992). Indeed, Skokie's mayor and corporation counsel at the Village board meeting both stated that only if North Shore obtained a state license would it be allowed to open the home. Thus, even if North Shore were to undertake the process of attempting to obtain a change in the law, its efforts likely would be futile.

**4.** *See* the discussion about the effects of prejudice against handicapped individuals in *School Board of Nassau County v. Arline,* 480 U.S. 273, 284–85, 107 S.Ct. 1123, 1129–30, 94 L.Ed.2d 307 and accompanying footnotes (1987).

the same decision simply on the basis of its ordinance need not be decided on this motion. As discussed below, even if Skokie did not act with an improper motive, North Shore has demonstrated a reasonable likelihood that it will be able to show that Skokie's refusal to allow it to open its home has a discriminatory impact on the brain injured individuals it hopes to serve.

At the evidentiary hearing, North Shore presented convincing evidence that a facility such as North Shore's is needed, that brain-injured persons would have a much better chance for a successful rehabilitation if they could spend time in a facility such as the one North Shore proposes, and that the Karlov Street location is important because it is in a quiet neighborhood yet located near transportation and other public services.

Section 804(f)(3)(B) of the Fair Housing Act, as amended, makes it unlawful to fail to make "reasonable accommodations in rules, policies, practices or services ... necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). "Reasonable accommodation" has been defined as "changing some rule that is generally applicable so as to make its burden less onerous on the handicapped individual." *Oxford House, Inc. v. Township of Cherry Hill*, 799 F.Supp. 450, 462 n. 25 (D.N.J.1992).

In order to determine whether Skokie's refusal to grant North Shore an administrative occupancy permit is likely to be found to be a violation of the reasonable accommodation provision of the Fair Housing Act, Skokie's zoning laws must be considered. Skokie says North Shore does not meet its requirements because it says it cannot obtain a state license[5] and because the proposed residents are not intended to reside in the home on a permanent basis.[6] Skokie did not put on any

evidence as to the purpose for its licensing requirement. The only legitimate purpose for the requirement that is apparent would be to provide some assurance that a residence in which persons live who are not a family and who are disabled in some way and under the supervision of others meets at least minimal standards. Even if the requirement serves a health or welfare interest, however, where, as here, the state does not license a particular type of group living facility for the handicapped, Skokie's refusal to allow these people to live together adversely impacts brain injured individuals on the basis of their handicap. Furthermore, North Shore has offered a substitute for state licensure, in volunteering to seek accreditation by CARF, as soon as it can meet the six-month requirement for accreditation. All of the medical witnesses testified that CARF is highly respected, and that it will not accredit a facility that does not meet its high standards. Accordingly, I conclude that North Shore has shown a reasonable likelihood that it will be successful in proving that Skokie's refusal to waive the requirement of a state license fails to make a reasonable accommodation for the handicap suffered by brain injured individuals.

Skokie also argues that because the expected length of time that individuals would reside in North Shore's facility is from three to 18 months, they clearly will not occupy the home on a "permanent" basis as required by the ordinance. Skokie has not defined "permanent" and it does not require that families who occupy a single family residence agree that they will stay "permanently." There is also no requirement that residency be "permanent" in "community live-in residences," which differ from group homes principally in the number of bedrooms. Thus, while long term residency undoubtedly promotes values important to a community, Skokie has failed

---

5. The evidence showed that North Shore had written to the appropriate state agencies. Based on the representations made by North Shore, the agencies wrote back stating that the facility did not need a state license because it did not fit their criteria for being a nursing home or other licensed facility.

6. Alternatively, Skokie argues that the proposed home will be a nursing home. Skokie does not

allow nursing homes in R–1 zoned areas. However, whether the home is a nursing home under state law is an administrative determination to be made by the state. The label that a state administrative agency would give to this facility is not determinative of the issues before this court. *E.g., United States v. Borough of Audubon, N.J., supra,* 797 F.Supp. at 357.

to offer any reason why residents of a group home such as North Shore's must meet the requirement (or even shown what it means; is a year, for example, "permanent?"), when no other residents in R–1 zoned areas are required to do so. Under these circumstances, I conclude that North Shore is also likely to be able to prove that the requirement of permanency as applied to the proposed residents of North Shore's facility fails to make a reasonable accommodation for their handicap.

The legislative history to the 1988 amendments supports these conclusions. That history states, with respect to zoning laws and practices:

> The Committee intends that the prohibition against discrimination against those with handicaps apply to zoning decisions and practices. The Act is intended to prohibit the application of special requirements through land-use regulations, restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community. . . .

House Rep. No. 100–711, 100th Cong. at 24, *reprinted in* 1988 U.S.Code Cong. & Admin.News 2173, 2185 (1988).

These conclusions are also supported by decisions of other courts that have considered the relationship between zoning laws and the Fair Housing Act 1988 amendments as they relate to handicapped individuals. *E.g., Horizon House Developmental Services, Inc. v. Township of Upper Southampton, supra,* 804 F.Supp. at 683 (granting injunction against enforcement of ordinance that imposed 1,000 foot spacing requirement between group homes); *Oxford House, Inc. v. Township of Cherry Hill, supra,* 799 F.Supp. at 450 (granting preliminary injunction against enforcement of zoning ordinance to prevent group of recovering alcoholics from renting and occupying a house in a single family residential zone); *Easter Seal Society of New Jersey, Inc. v. Township of North Bergen,* 798 F.Supp. 228 (D.N.J.1992) (granting preliminary injunction requiring town to issue construction permit for construction of home for developmentally disabled); *United*

*States v. Borough of Audubon, N.J., supra,* 797 F.Supp. at 353 (granting injunctive relief and monetary penalty against town that refused to allow a home for recovering substance abusers in a residential neighborhood).

For all of these reasons, I conclude that North Shore has shown a reasonable likelihood that it will prevail on the merits of this case.

### b. *Irreparable Injury and Lack of Adequate Remedy at Law*

Where a plaintiff has shown a likelihood of success in proving a violation of the Fair Housing Act, irreparable injury is presumed. *Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1423 (11th Cir.1984). Furthermore, the Seventh Circuit has held that where a statute specifically provides for the grant of injunctive relief, irreparable injury need not be shown. *Illinois Bell Telephone Co. v. Illinois Commerce Commission,* 740 F.2d 566, 571 (7th Cir.1984). The Federal Housing Act provides that where "the court finds that a discriminatory housing practice has occurred or is about to occur" the court may grant "any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate)." 42 U.S.C. § 3613(c). North Shore has, in addition, introduced evidence that it is being harmed by the delay, and the evidence showed that due to the lack of homes of the type North Shore proposes to open, brain injured individuals are suffering continuing harm. Thus, even if North Shore had been required to show irreparable harm, I would conclude that it had satisfied the requirement.

It is also clear that North Shore does not have an adequate remedy at law. Only injunctive relief can provide a remedy where the harm is the inability to obtain an occupancy permit due to zoning restrictions.

### c. *Balance of Harms and Public Interest*

In its opposition to the motion for a preliminary injunction, Skokie has not argued that it will be harmed by the issuance of a preliminary injunction. I agree that the evi-

**510**

dence does not indicate any such harm. While at the public hearing before the Village board, residents did express concern that their children would be harmed, there is no evidence in the record that would support such fears. Indeed, as noted earlier, the fears expressed appear to be exactly the kind of irrational and "unfounded speculations about threats to safety" that the 1988 amendments to the Fair Housing Act "specifically rejected as grounds to justify exclusion." House Report No. 100–711 *supra*, at 18, 1988 U.S.Code Cong. & Admin.News at 2179.

I also conclude that the public interest will be served by the entry of an injunction in this case. As the court noted in *Baxter v. City of Belleville, supra*, 720 F.Supp. at 734, "the public interest can best be served if discriminatory actions based on irrational fears, piecemeal information and 'pernicious mythologies' are restrained." The residents on Karlov Street do have a legitimate interest in maintaining the quality of their neighborhood, which is apparently a quiet, peaceful street. At the Village board hearing, there appeared also to be some concern that too many vehicles might be parked at the residence. While it seems unlikely that the brain injured residents will be able to drive (an assumption I make from the testimony in general since this issue was not specifically addressed), Skokie can probably put reasonable limits on the number of vehicles that can be parked at North Shore's facility, within the requirements of reasonable accommodation under the Fair Housing Act.

### Conclusion

For the reasons stated in this opinion, I recommend that North Shore's motion for entry of a preliminary injunction be granted. I note that while North Shore seeks an injunction requiring Skokie to issue the occupancy permit, that would be premature. North Shore must comply with all reasonable requirements for issuance of an occupancy permit. Skokie, and the prospective residents of the facility, have a right to have the usual rules and inspections that would apply to any other facility applied to North Shore's proposed home. Skokie should not, however, be allowed to delay or refuse any permit, including the occupancy permit, on the ground that its zoning ordinance does not permit the proposed North Shore facility.

Dated: May 20, 1993.