**TURNING POINT, INC.,**
**Plaintiff–Appellant,**

v.

**CITY OF CALDWELL; Caldwell Planning and Zoning Department, Defendants–Appellees.**

**TURNING POINT, INC.,**
**Plaintiff–Appellee,**

v.

**CITY OF CALDWELL; Caldwell Planning and Zoning Department, Defendants–Appellants.**

Nos. 95–35223, 95–35237.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 5, 1995.

Decided Jan. 24, 1996.

John H. Bradbury, Lewiston, Idaho, for Plaintiff–Appellee.

Kirtlan G. Naylor, Hamlin & Sasser, Boise, Idaho, for Defendants–Appellants.

Before: D.W. NELSON and JOHN T. NOONAN, Circuit Judges, and TANNER *, District Judge.

* Honorable Jack E. Tanner, Senior United States District Judge for the Western District of Washington, sitting by designation.

NOONAN, Circuit Judge:

Turning Point, Inc., a nonprofit Idaho corporation, brought suit against the City of Caldwell, Idaho, and the Caldwell Planning and Zoning Department (collectively, Caldwell). Turning Point alleged that the zoning ordinance of Caldwell was unconstitutionally vague and that its enforcement against Turning Point was a violation of the Fair Housing Act, 42 U.S.C. § 3601, et seq. The district court made findings in favor of Turning Point on certain issues and in favor of Caldwell on other issues and gave limited relief to Turning Point. Turning Point's appeal is on the issues decided against it and the extent of relief granted. Caldwell cross-appeals the damages awarded. We expand the relief, reduce the damages, and remand to the district court.

### FACTS

The City of Caldwell is located about 25 miles west of Boise. According to the 1990 census, it has a population of 32,441. The further following facts are taken from the findings of fact made by the magistrate judge. They are undisputed on appeal:

In 1991 Caldwell lost its only existing homeless shelter, Maranantha House. Turning Point then began its search for property to use for a homeless shelter. It was operated by Phillip J. Bush and his wife Gayle Bush, whose mother Elaine Chapin had been involved with Maranantha House. The Bushes believed that Maranantha House's demise was due to its inability to obtain a Special Use Permit (SUP) from the Planning and Zoning Department. To avoid repetition of that experience, the Bushes sought to resolve zoning problems before buying any property for Turning Point.

During 1991 Turning Point was offered the single-family residence of Ed Perry at 703 Belmont, a two-story home with 3,700 square feet of interior space. The Bushes contacted the Planning and Zoning Department and talked to staff who gave them the impression that they would not need a SUP for a shelter at 703 Belmont. Following the meeting Turning Point bought the property and a duplex next door at 709 Belmont. In March 1992 Turning Point opened both houses as 24–hour emergency shelters for the homeless, offering shelter, food, and counseling with social workers. Residents are assigned chores, assisted in looking for employment and referred to possibilities for permanent housing. The majority of residents are adult women with minor children; there are also some families with fathers and a few single men without children. Seventy-five percent of the residents have a serious physical or mental impairment that affects a major life activity. These disabilities prevent these persons from maintaining employment, obtaining education or securing permanent housing. At least one member of nearly every family at Turning Point suffers from such impairments.

When the shelter opened in March 1992, Turning Point planned to serve 16 homeless people at 703 Belmont and then to increase the number after renovations were made. It learned from the building inspector that it would need to install a fire alarm system wired through the house; install an emergency light system; and build an upstairs fire exit. These renovations were made. Turning Point increased its residents at the property to 39 occupants by June 1, 1993.

In July 1993 a small fire started in a mattress on the second floor. In the course of putting out the fire, the fire department found overcrowded conditions and heard that there had been up to 45 people residing in the facility at one time. On the night of the fire there were 28 persons. The building inspector did a follow-up report and wrote Turning Point on July 31, 1993, informing it that, under the Uniform Building Code, 703 Belmont could house more than ten people only if it moved the ceilings on the second floor up to 7 feet, 6 inches; gave bedrooms on the second floor a minimum area of 70 square feet and minimum width of 7 feet; provided two legal exits for the upstairs; gave all bedrooms exit windows and made improvements in the smoke detectors and fire alarms. With these changes, the inspector wrote, 703 Belmont would qualify for R–1 Occupancy, so that Turning Point could operate as a "congregate" residence housing more than 10 persons. ("Congregate" is an

adjectival neologism, now aptly used to describe the housing of communal groups.)

On receiving this letter Turning Point contacted Dennis Crooks, Director of the Planning and Zoning Department, who replied on September 27, 1993 that 703 Belmont was in a commercial zone, C–2. Crooks characterized 703 Belmont as "a boardinghouse," the maximum occupancy of which was limited to 12 persons by the city's zoning ordinance. If Turning Point wanted to house more than 12, the residence would have to be reclassified as "public/semi-public housing"; to have such a use in a C–2 commercial zone would require a SUP. Until the SUP was completed, occupancy must be limited to 12.

In response, Turning Point filed for a SUP stating that it wanted to operate a congregate residence to serve homeless persons and that in the past it had accommodated an average of 33 homeless individuals. It asked to be permitted to accommodate up to 40 residents at 703 Belmont and to expand 709 Belmont from a duplex to a triplex. Meanwhile it observed the restriction of housing an average of 12 residents at 703 Belmont.

According to the zoning ordinance, a C–2 zone is to "fulfill shopping retail needs including central business area preferences." The zoning permits mobile homes on single family lots in the area; it also permits a car wash, a service station and a tire shop without any requirement of a SUP. Public and semi-public uses, which are identified as including schools, churches, cemeteries, and hospitals, may be located in a C–2 zone only by grant of a SUP.

The staff of the Planning and Zoning Commission ("the Commission") recommended approval of the application for the triplex at 709 Belmont and of the SUP for 703 Belmont with conditions, of which the most important was a limitation of 703 Belmont's occupancy to 18 residents. At the first meeting of the Commission on the application, on November 18, 1993, Turning Point contended that the occupancy limitations discriminated against the handicapped in violation of the Fair Housing Act.

The Commission also received a report by Building Inspector Rolf that stated that the Uniform Housing Code would permit 17 persons to occupy the first floor and 8 persons to occupy the second floor of 703 Belmont, with an accommodation in the requirements to permit bedroom ceilings of less than 7 feet, 6 inches. The police chief of Caldwell reported that the number of calls for police services were excessive for what was "a residential district"; the police chief did not acknowledge that, in fact, the district was zoned for commercial uses.

On December 16, 1993 the Commission granted a SUP, turning 709 Belmont into a triplex with conditions, and granted a SUP for 703 Belmont with a maximum occupancy limited to 25 individuals including one resident staff member; a requirement of .33 parking spaces per person; a requirement of a new sidewalk and landscaping; and a requirement of annual review of the SUP.

Turning Point appealed to the City Council on the ground that the occupancy limit was too low. A resident appealed on the ground that the occupancy limit was too high. On February 21, 1994 and March 10, 1994 hearings on these appeals were held before the City Council. Turning Point repeated its claim that there was discrimination against the handicapped. Three neighbors complained of problems of garbage, parking and fighting connected with the shelter. City Councilman Garrett Nancolas asked the fire chief what he thought was "the real number of people that should occupy that place and be safe." The chief said: "I am comfortable with the 25." At the March 10, 1994 meeting Councilman Nancolas emphasized "the incidents of disruption, traffic problems with the possible overall clamor" that disturbed "some residents that have been there for 40 and 45 and 50 years." To preserve "the integrity of the neighborhood" he said that people should not be crowded into the residence. He then said: "The letter of the law dictates that 25 is an acceptable figure. However, the spirit of the law, to me, dictates that a far less number than that should be allowed." He proposed 15 as "the tolerable number," and the majority of the Council agreed. In addition to the occupancy limit, the SUP, as granted, provided other conditions, which will be discussed below.

## PROCEEDINGS

On April 19, 1994 Turning Point began this suit in the district court alleging a violation of 42 U.S.C. § 3604 in the application of the SUP provisions of Caldwell's ordinance to 703 Belmont. Turning Point also sought to have the SUP section of the zoning ordinance declared unconstitutional for vagueness. By agreement of the parties the case was tried before Magistrate Judge Larry Boyle, a former Justice of the Supreme Court of Idaho. On December 28, 1994 he entered his judgment and made the findings of fact which have been summarized above.

Magistrate–Judge Boyle's most salient conclusions were as follows:

(1) Caldwell had proceeded in good faith and had not intentionally discriminated against the handicapped, nor had its actions had disparate impact upon them.

(2) Nonetheless, the occupancy limitation was "not calculated according to any uniform code or zoning ordinance; was not designed to preserve the character of a single-family residential zone . . .; and was a severe financial burden on Turning Point that would eventually force it to close." For these reasons, the occupancy limitation was unreasonable, and Caldwell had failed to make a reasonable accommodation for the handicapped in violation of 42 U.S.C. § 3604(f).

As a remedy for this violation, the court ordered that the occupancy be set at 25. The court further reduced the parking requirement to a total of 5 off-street parking spaces. It also eliminated as unreasonable the requirement for a new sidewalk and the requirement for new landscaping.

At the same time, the court upheld the SUP's requirement that Turning Point maintain the historic integrity of 703 Belmont; that it observe certain conditions as to garbage, vegetation, and as to a secure play area for children. The court regarded regular review of the SUP as "a crucial component" because accommodations that might be "reasonable at this time may later become unreasonably burdensome to Defendants due to a change of circumstances." The court therefore maintained the condition of an annual review.

The court enjoined enforcement of the conditions it found not to be reasonable accommodations. It awarded damages to Turning Point of $5,618, representing lost program reimbursement for meals for children because of the restriction placed on the number of residents. The loss was calculated by taking Turning Point's average occupancy as 35 and its restricted occupancy as 12, leaving a net loss of 23 occupants, half of whom were assumed to be children whose meals would have been reimbursed to Turning Point. The court made a deduction for what the actual cost of the food would have been so that Turning Point received only its calculated operating cost for its food programs.

Turning Point now appeals, contending that the ordinance requiring the SUP is unconstitutional; contending that Caldwell intentionally discriminated against the handicapped and that its enforcement of the ordinance had a disparate impact on the handicapped; and arguing that the relief granted under the Fair Housing Act is too limited. Caldwell cross-appeals the amount of the damages awarded.

## ANALYSIS

■ 1. *The Unconstitutionality of the Ordinance.* Caldwell's zoning ordinance is a complicated and comprehensive plan for the orderly regulation of development within the city. It is typical of many such city ordinances. The particular provision attacked by Turning Point, Zoning Ordinance § 6–4–4(A), must be read in the context of the entire ordinance, which is amply detailed in its criteria. Section 6–4–4(A) gives the Commission authority to determine whether the use "would cause any damage, hazard, nuisance or other detriment to persons or property in the vicinity." Such language is characteristic of zoning regulation. It is not so general as to be unintelligible to any reasonable owner of property. It is constitutional. *Williams v. City of Columbia,* 906 F.2d 994, 998 (4th Cir.1990); *see also, United States v. Doremus,* 888 F.2d 630 (9th Cir.1989), *cert. denied,* 498 U.S. 1046, 111 S.Ct. 751, 112 L.Ed.2d 772 (1991).

2. *The Failure to Accommodate and its Remedy.* Caldwell does not appeal the ruling that it violated 42 U.S.C. § 3604(f)(3)(B) by failing in its affirmative duty to reasonably accommodate handicapped persons. There was nothing to appeal in this ruling because this ruling faithfully reflected the direction that our decision in *City of Edmonds v. Washington State Building Code Council,* 18 F.3d 802 (9th Cir.1994), took, subsequently affirmed in *City of Edmonds v. Oxford House, Inc.,* — U.S. —, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995). The Fair Housing Act exempts from its requirements "any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling," 42 U.S.C. § 3607(b)(1). But the Fair Housing Act is violated when a municipality refuses "to make reasonable accommodations" in its rules when "such accommodations may be necessary" to afford handicapped persons "equal opportunity" for housing. 42 U.S.C. § 3604(f)(3)(B). In *City of Edmonds,* we noted that whether a city will have to alter its policies to accommodate the handicapped is a question where "answers will vary depending on the facts of a given case." 18 F.3d at 806. Here the facts have been found. They demonstrate Caldwell's need to accommodate. Here, beyond dispute, it was found that housing for the handicapped was affected by Caldwell's insistence on an occupancy level that was unreasonable.

Turning Point does not dispute that a maximum occupancy of 25 persons for 703 Belmont is now a reasonable accommodation for the handicapped. Hence on this appeal there is a significant amount of agreement between the parties.

■ The crux of their disagreement is the requirement that the SUP be subject to annual review. We can perceive no persuasive justification for this requirement. The contingencies to which the district court alluded appear to be controllable under the ordinary law of nuisance and the city's power to declare and abate nuisances. IDAHO CODE § 50–334 (1994); *Rowe v. City of Pocatello,* 70 Idaho 343, 348, 218 P.2d 695, 698 (1950). Consequently, we direct the district court to eliminate the condition of annual review of

the SUP. No other condition of the SUP is in dispute. The district court has permanently enjoined the city from enforcing the conditions that are not reasonable accommodations.

Reaching this conclusion, we find it unnecessary to consider Turning Point's arguments that it had shown intentional discrimination or disparate impact. Neither argument would lead to a different conclusion than the one we reach.

3. *Damages.* The damages calculated by the magistrate judge were on the basis that it would have been reasonable for Turning Point to have had an average occupancy of 35. But it is agreed that the reasonable occupancy would have been 25. The damages must be recalculated on that basis.

Accordingly, the case is **REMANDED** to the district court with the direction that the damages be recalculated and that the judgment be modified to eliminate annual review of the Special Use Permit. The Fair Housing Act, 42 U.S.C. § 3612(p), empowers courts to award appropriate attorney's fees; Turning Point may request an award of attorney's fees under this section from the district court. The judgment of the district court is otherwise **AFFIRMED.**