**CONNECTICUT HOSPITAL, et al., Plaintiffs,**

v.

**CITY OF NEW LONDON, et al., Defendants.**

**Civ. No. 3:00CV1987 (AHN).**

United States District Court, D. Connecticut.

Jan. 26, 2001.

Theodore Tucci, Robert Sitkowski, Hartford, CT, for plaintiffs.

Thomas Lundregan, Brian Estep, New London, CT, for defendants.

### RULING ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

FITZSIMMONS, United States Magistrate Judge.

Plaintiffs bring this action alleging violations of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq.; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; and through 42 U.S.C. § 1983, the Equal Protection Clause of the Fourteenth Amendment. [Doc. # 1.] On October 17, 2000, plaintiffs filed their *Motion for Preliminary Injunction* [Doc. # 8], on which a hearing was held on November 20 and November 21, 2000.[1] At the close of the preliminary injunction hearing, the court informed the parties that it would be ordering further briefing on several issues. [Doc. # 26.] After the parties submitted responses to the court's inquires, oral argument was conducted on December 19, 2000. For the reasons discussed below, plaintiffs' **Motion for Preliminary Injunction** [Doc. # 8], is **GRANTED in part and DENIED in part. Defendants are ordered to refrain from enforcing the three cease and desist orders issued for the properties involved in this case.** On the current record, the court declines to grant plaintiff the further requested relief of prohibiting defendants from otherwise directly or indirectly interfering with the operation of these off-campus houses, as such an order would be unnecessarily broad at this stage of the proceedings. This ruling is without prejudice to plaintiffs' seeking further interim

---

1. On December 19, 2000, the parties consented to this judge's exercise of the court's jurisdiction to decide the pending motion.

relief if faced with actions by the defendants which threaten the plaintiffs' rights while the case is pending, or permanent injunctive relief if plaintiffs prevail on the merits. *See Sierra Club v. United States Army Corps of Eng'rs*, 732 F.2d 253, 256 (2d Cir.1984) (preliminary injunction issues to maintain the status quo pending a resolution of the case on the merits).

*BACKGROUND*

Plaintiffs Property Resource Management, Michael Angelides, and Robert Fox own three New London properties now used as group housing facilities. [Preliminary Injunction Hearing Transcript, Nov. 20, 2000, "T. 11/20/00" at 10.] Also known as off-campus housing ("OCH"), these facilities are run in conjunction with treatment programs for recovering alcoholics and substance abusers operated plaintiff Connecticut Hospital Management Corporation d/b/a The Stonington Institute ("Stonington Institute").[2] [T. 11/20/00 at 15.] Three anonymous plaintiffs, John Does One through Three, who are recovering alcoholics and drug addicts, are current or prospective residents of these properties, located at 29 Brainard Street, 138 Huntington Street, and 15/17 Huntington Street in New London, Connecticut.[3] [Doc. # 1.] The group homes serve recovering substance and alcohol abusers who are participating in the Stonington Institute's day treatment program. [T 11/20/00 at 8, 44.] As recovering alcoholics and substance abusers, the residents of these OCH facilities are handicapped as defined in the FHA, 42 U.S.C. § 3602(h), and are protected by the Act.[4]

The residents of these group homes receive therapy and treatment on an outpatient basis from the Stonington Institute but receive no treatment or therapy at any OCH.[5] [T. 11/20/00 at 19.] The clients of Stonington Institute generally live in the group homes during their initial period of sobriety. [T. 11/20/00 at 17–18.] This phase often occurs after the client completes the in-patient treatment located on the grounds of the Stonington Institute. [T. 11/20/00 at 17–18.] These OCH's are not licensed by the State of Connecticut to provide any on-site therapy or treatment. [T. 11/20/00 at 19.]

The homes are generally self-governing, with house members setting their own rules and working out most problems themselves. [T. 11/20/00 at 43 94–95.] A caretaker resides in each home and, for a stipend, maintain the property. Some caretakers may be employed by Stonington Institute but, in their role of caretaker, their primary responsibilities are to maintain the house, help residents shop for food and be a neighborhood resource for the clients. [T. 11/20/00 at 20–21.] The residents also elect a house representative who oversees the house and makes sure things run smoothly. [T. 11/20/00 at 95.] The houses also often have weekly house meetings to discuss problems and divide up chores. [T. 11/20/00 at 102.] Each morning, OCH residents take a van to the Stonington Institute for treatment which lasts until early afternoon. [T. 11/20/00 at 46, 99–100.] The residents then take the van back to the group home, where they

---

**2.** Mr. Fox and Mr. Angelides are also owners of the Stonington Institute. [T. 11/20/00 at 10.]

**3.** The property located at 29 Brainard Street has been used as a group home for participants in the Stonington Institute's treatment program since 1995. [T. 11/20/00 at 16.] The property located at 138 Huntington Street has been used in this capacity since 1997. [T. 11/20/00 at 22.] The property located at 15/17 Huntington Street has been

used by clients of the Stonington Institute since early 2000. [T. 11/20/00 at 23.]

**4.** Courts have also held that recovering alcohol and substance abusers are disabled, and receive protection under the ADA. 42 U.S.C. § 12210(a). *See also Innovative Health Systems, Inc. v. City of White Plains,* 117 F.3d 37, 48 (2d Cir.1997).

**5.** The outpatient program is also known as the day treatment or partial hospitalization program.

are able to have lunch, followed by a few hours of free time. [T. 11 20/00 at 48, 99–100.] Richard T., a current resident of one of the homes, testified that during this free time he engaged in a variety of activities ranging from volunteer work, to relaxing, to household chores. [T. 11/20/00 at 102–5.] House members often eat dinner together and attend a nightly Alcoholics Anonymous or Narcotics Anonymous meeting at another location as a group, but there is no requirement that residents participate in these activities together. [T. 11/20/00 at 105–07.]

Residents may stay in the houses as long as they are participating in the Stonington Institute treatment program. [T. 11/20/00 at 54.] The residents pay fifty dollars per week toward food and other household expenses.[6] [T. 11/20/00 at 59.]

The court heard testimony about the importance of this living environment to the residents while they receive treatment. Two current residents testified that they viewed the OCH's as their home and would have nowhere else to go if they could not live there.[7] [T. 11/20/00 at 111–12, 149.] Both residents stated that it was extremely beneficial to them to live in a place where everyone understood what the recovery process entailed and where, if needed, the residents could help each other with personal problems they might face during treatment. [T. 11/20/00 at 112, 150–51.] These residents testified that they would most likely suffer a relapse if they were unable to remain in the home. [T. 11/20/00 at 113, 150.]

The residents' testimony was supported by Dr. Richard Schottenfeld, who testified that the ability to live in a mutually supportive environment, such as the OCH facilities, had tremendous therapeutic value and was critical to the recovery period. [T. 11/20/00 at 179–82; Preliminary Injunction Hearing, November 21, 2000, "T. 11/21/00" at 6, 44–45.] William Aniskovich, executive director of the Stonington Institute, testified that many of the participants are actually homeless when they enter the program, while others are constructively homeless because they have no safe, supportive place to live. [T. 11/20/00 at 13, 34.] Mr. Aniskovich estimated that, of the 140 participants in the day treatment program, 100 were actually or constructively homeless. [T. 11/20/00 at 19.]

The house at 29 Brainard Street was previously used as a rooming house licensed for nine rooms and sixteen people. [T. 11/21/00 at 54.] Both Huntington Street properties were previously used as multi-family dwellings. [T. 11/21/00 at 53.] Mr. Fox and Mr. Angelides did not apply for zoning permits for any of the properties because they did not believe that there was a change in use of the houses. [T. 11/20/00 at 39.]

On February 15, February 24, and March 6, 2000, respectively, New London's zoning enforcement officer ("ZEO") Susan Brant issue cease and desist orders for 138 Huntington Street, 29 Brainard Street, and 15/17 Huntington Street. [T. 11/21/00 at 68, 70, 72.] The cease and desist orders required the owners to "cease the operation of a rehabilitative facility" at each location. [Doc. # 1.] They further stated that the evidence indicating the properties were being used as rehabilitation facilities included "providing services requiring a house supervisor, curfews, and holding meetings specifically for the residents" and "transportation to and from the Stonington Institute". [Id.] No information was sought from the Stonington Institute nor did the owners of the property know of the investigation until after the orders issued. [T. 11/20/00 at 26–27.]

---

6. The parties stipulated that $50 per week was not sufficient to cover the expenses of the group home and that the Stonington Institute provided supplemental funds to subsidize the properties. [T. 11/20/00 at 59–60.]

7. Plaintiff's expert witness, Dr. Richard Schottenfeld, testified that in his opinion Connecticut had a "critical shortage of supportive housing" for recovering substance abusers. [T. 11/20/00 at 182.]

The cease and desist orders were issued after the ZEO received complaints from the neighbors of 15/17 Huntington Street and reports from the police department that several crimes had been traced back to 138 Huntington Street. [T. 11/21/00 at 50.] It appears that, during the investigation of these complaints, 29 Brainard Street was determined to be under common ownership and used for the same purposes as the Huntington Street properties. [T. 11/21/00 at 54.] The ZEO determined that, because all three properties were being used as rehabilitative facilities, there had been a change from the prior use of the properties.

Plaintiffs appealed these cease and desist orders to the Zoning Board of Appeals ("ZBA") in March, 2000. [Exhibit 2, Tabs 10–12.] Plaintiffs also sought a reasonable accommodation from the Town of New London by proposing a text amendment to the zoning regulations which would accommodate this type of group home.[8] [T. 11/20/00 at 33.] On July 10, 2000, plaintiffs requested other alternative forms of reasonable accommodation from the town. [T. 11/20/00 at 28; Exhibit 2, Tab 14.] First, plaintiffs asked that the cease and desist orders be withdrawn, or stayed pending the outcome of the ZBA's decision on the reasonable accommodation requests. [T. 11/20/00 at 28.] Second, plaintiffs petitioned the ZBA for use variances to allow the continued operation of the group homes. [T. 11/20/00 at 29.]

On August 31, 2000, the ZBA held a public hearing on plaintiffs' variance request and appeals from the issuance of the cease and desist orders. [T. 11/20/00 at 29.] The ZBA voted to deny the variance request and uphold the cease and desist orders on September 28, 2000. [Exhibit 6.] New London zoning officials have not yet made any decision on plaintiffs' proposed amendment. [T. 11/20/00 at 34.]

Plaintiffs filed this action on October 17, 2000. [Doc. # 1.]

*STANDARD*

The question presented by plaintiffs' motion for preliminary injunction is whether the defendants' efforts to stop the operation of the three Stonington Institute group housing facilities discriminate against the plaintiffs in violation of either the FHA or the ADA. Plaintiffs argue that in this instance the FHA has been violated by defendants' discrimination against a protected class (the operators and residents of the group homes) in three ways: 1) discriminatory treatment; 2) discriminatory effect, also referred to as disparate impact; and 3) the failure of the town to make a reasonable accommodation for plaintiffs' disability.

It is axiomatic that a plaintiff seeking a preliminary injunction must demonstrate: "(a) irreparable harm, and (b) either (1) a likelihood of success on the merits, or (2)

**8.** Plaintiffs' proposed amendment provided a definition for a "Group Home for the Disabled" as "a residential facility housing not more than 16 disabled or handicapped residents for which a reasonable accommodation must be made pursuant to the Fair Housing Amendments Act and at least one, but not more than two, full-time supervisory personnel." [Exhibit 4, Tab A.] Plaintiffs also proposed a new Section 622, which read:
*Group Home for the Disabled*
In addition to the Special Permit requirements of Article VIII. Section 810, the following requirements apply:
 1. The maximum occupancy of any single Group Home for the Disabled shall be 16 residents and not more than two supervisors.

 2. A supervisor shall reside on-site full time.
 3. No rehabilitation, formal counseling, therapy, treatment or other related services shall be provided within the Group Home for the Disabled.
 4. Each Group Home for the Disabled shall file a contact list with the Police Department and the Zoning Enforcement Officer.
 5. Any Group Home for the Disabled operating as of the effective date of this regulation in any zoning district other than the R–3, R–4, C–1 or INST districts shall cease operation within 5 years of the effective date of this regulation.
[*Id.*]

sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979); *Paulsen v. County of Nassau,* 925 F.2d 65, 68 (2d Cir.1991). The Second Circuit has ruled that "one exception to the ordinary standard is that, where a preliminary injunction is sought against government action taken in the public interest pursuant to a statutory or regulatory scheme, the less-demanding fair ground for litigation standard is inapplicable, and therefore a likelihood of success must be shown." *Forest City Daly Housing, Inc. v. Town of North Hempstead,* 175 F.3d 144, 149 (2d Cir.1999) (internal quotations omitted). However, there has been some debate as to whether this exception only applies to "mandatory" (altering the status quo) injunctions against the government or if it also encompasses "prohibitory" (maintaining the status quo) injunctions.[9] *See id.,* at 150 n. 6; *Time Warner Cable of New York City v. Bloomberg L.P.,* 118 F.3d 917, 923–24 (2d Cir.1997) (noting that "[t]his Circuit has offered differing views on the appropriate standard for issuance of a preliminary injunction against government action"). *Cf. Oxford House, Inc. v. City of Albany,* 819 F.Supp. 1168, 1176 (N.D.N.Y.1993) (preliminary injunction granted against city on the lower fair grounds for litigation standard because question of fact precluded a finding under the likelihood of success standard).

Although acknowledging the existence of this question, this court need not answer it in the context of this case. Here, as discussed below, the court finds that plaintiffs have met their burden of showing a likelihood of success on the merits of their claim.[10]

## A. IRREPARABLE HARM

■ Irreparable harm means that type of injury for which a monetary award would fail to be adequate compensation. *See Jackson Dairy,* 596 F.2d at 72; *Stewart B. McKinney Found. v. Town Plan and Zoning Commission of Town of Fairfield,* 790 F.Supp. 1197, 1208 (D.Conn. 1992). *See also Forest City Daly Hous.,* 175 F.3d at 153 ("irreparable harm is injury that is neither remote nor speculative, but actual and imminent : . .."). The Second Circuit has noted in dicta that there is support for the proposition that "where a plaintiff demonstrates a likelihood of success on the merits of a fair housing claim, irreparable injury may be presumed," but has not squarely addressed the issue. *Forest City Daly Hous.,* 175 F.3d at 153. *See, e.g., Stewart B. McKinney,* 790 F.Supp. at 1208; *Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1423–24 (11th Cir.1984); *North Shore–Chicago Rehabilitation, Inc. v. Village of Skokie,* 827 F.Supp. 497, 509 (N.D.Ill.1993).

■ The Court finds that irreparable harm may be presumed in this case because, as discussed below, plaintiffs have established a likelihood of success on their claim that their rights under the FHA have been violated. Although this presumption is rebuttable, defendants have not presented any evidence that the injury plaintiffs would suffer in the absence of an injunction would not be irreparable. *See Stewart B. McKinney,* 790 F.Supp. at 1208.

---

9. This court concurs in the Second Circuit's observation that the differences between the two are "often more semantical than substantive." *Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37, 43 (2d Cir.1997) (internal quotations omitted).

10. The court declines to address plaintiffs' argument that the fair ground for litigation standard applies in this case because "neither party has an exclusive claim on the public interest where one seeks to enjoin government action that violates his or her statutory or constitutional rights." [Doc. # 31 at 9 n. 10], *citing Almonte v. Pierce,* 666 F.Supp. 517, 526 (S.D.N.Y.1987).

Even if irreparable harm were not presumed in this case, plaintiffs have presented sufficient evidence to prove this element. Plaintiffs include recovering drug addicts and alcoholics who are living in the group homes while they are in treatment at the Stonington Institute. As part of their treatment, plaintiffs need to live in a safe, "mutually-supportive," and drug-free living environment during the recovery period. [T. 11/20/00 at 62–62.] *See also, Oxford House, Inc. v. Town of Babylon,* 819 F.Supp. 1179, 1183 (E.D.N.Y.1993) ("Recovering alcoholics or drug addicts require a group living arrangement in a residential neighborhood for psychological and emotional support during the recovery process."); *Oxford House, Inc. v. Township of Cherry Hill,* 799 F.Supp. 450, 456 (D.N.J.1992) (noting that it is "crucial for recovering alcoholics and substance abusers to have a supportive, drug and alcohol-free living environment," ... "which substantially increases an individual's chance of recovery"). For the Stonington Institute clients who do not have another supportive place to live during this time, these facilities are an integral part of the recovery process.[11] The court heard testimony from two current residents of the group homes that they considered these houses to be their "homes" and that the residents supported each other throughout recovery. [T. 11/20/00 at 111–12, 149.] Both residents testified that, if these homes did not exist, it would be very likely that the residents would relapse into drug and alcohol use because they would no longer be living in a sufficiently supportive environment to help them through the initial phases of treatment.[12] [T. 11/20/00 at 113, 150.]

The Court finds that monetary damages would be inadequate to compensate plaintiffs if defendants shut down operation of the group homes before the merits of plaintiffs' claims are adjudicated. The risks of relapse to the individual plaintiffs and the fact that many of the residents have no other housing available to them, underscore the seriousness of the potential harm plaintiffs face if the OCH's are not operational. *See also Oxford House, Inc. v. City of Albany,* 819 F.Supp. 1168, 1173 (N.D.N.Y.1993) (accepting "conclusions that if the residents are displaced of their recovery residences ... the chances are greatly increased that they will relapse into a life of alcohol or chemical addition"); *Township of Cherry Hill,* 799 F.Supp. at 463 (noting the Third Circuit had "held that an action that jeopardizes the recovery process for a group of alcoholics and threatens to push them to relapse causes just the kind of irreparable harm that justifies preliminary injunctive relief"). The Court further finds that monetary damages would be inadequate to compensate the other plaintiffs for their inability to provide housing to recovering drug and alcohol addicts who need it to sustain their recovery. Thus, the Court concludes that plaintiffs have shown irreparable harm.

## B. LIKELIHOOD OF SUCCESS ON THE MERITS: FAIR HOUSING ACT

Plaintiffs argue that the town's attempt to stop the operation of the three group homes violates plaintiffs' rights under the FHA in three ways. Section 3604(f)(1) makes it unlawful

> to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—
>
> (A) that buyer or renter,

11. Plaintiffs' witness, William Aniskovich, described many of these residents as "constructively homeless" because they had no other place to go to as they went through recovery. [T. 11/20/00 at 13.]

12. The court also heard testimony from Dr. Schottenfeld that 80–90% of drug or alcohol addicts who relapse do so during the first year of sobriety. [T. 11/20/00 at 176.] Of these, 80–90% of the relapses occur within the first two months. [T. 11/20/00 at 176.] Dr. Schottenfeld noted that in this period it is most crucial for persons in recovery to live in a supportive environment [T. 11/20/00 at 175–76], testimony which the court credits.

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available, or

(C) any person associated with that buyer or renter.

Plaintiffs claim two violations of this provision. First, plaintiffs may show that section 3604(f)(1) was violated by presenting evidence of "discriminatory intent" on the part of the defendants. The evidence must show that the handicapped status of the residents of the group homes was one factor, but not necessarily the sole factor, in defendants' zoning decisions. *See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977); *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1042 (2d Cir.1979); *Stewart B. McKinney*, 790 F.Supp. at 1210–11.

Plaintiffs also claim a violation of this provision using a "disparate impact analysis." This method "considers whether the effect of a defendant's action is unnecessarily discriminatory even though plaintiff does not show an intent to discriminate." *Stewart B. McKinney*, 790 F.Supp. at 1211, *citing Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights* 558 F.2d 1283, 1290 (7th Cir.1977), *cert. denied* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978). *See also* H.R.Rep. No. 711, 100th Cong., 2d Sess. 24 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2185. ("The Act is intended to prohibit the application of special requirements through land-use regulations, restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such persons to live in the residence of their choice in the community.").

Plaintiffs' final argument is that defendants have violated the FHA by failing to make a reasonable accommodation for plaintiffs' handicap as required by section 3604(f)(3)(B). This provision states that discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling...." 42 U.S.C. § 3604(f)(3)(B). The legislative history accompanying this section requires a defendant to take affirmative steps to change its rules or practices if necessary to allow a handicapped person to use or enjoy a dwelling.

The concept of "reasonable accommodation" has a long history in regulations and case law dealing with discrimination on the basis of handicap. A discriminatory rule, policy, practice or service is not defensible simply because that is the manner in which such rule or practice has traditionally been constituted. This section would require that changes be made to such traditional practices if necessary to permit a person with handicaps an equal opportunity to use and enjoy a dwelling.

H.R.Rep. No. 10–711, 100th Cong., 2d Sess., 25, *reprinted in* 1988 U.S.C.C.A.N. 2173, 2186. This mandate has been interpreted by courts to mean that reasonable accommodations must be made to allow a handicapped individual to use a particular dwelling, "not just some dwelling somewhere in town." *Oxford House, Inc. v. Town of Babylon*, 819 F.Supp. 1179, 1185 n. 10 (E.D.N.Y.1993), *citing Oxford House—Evergreen v. City of Plainfield*, 769 F.Supp. 1329, 1344 (D.N.J.1991). This analysis is very fact specific and requires a case by case determination. *See Town of Babylon*, 819 F.Supp. at 1185 (collecting cases); *ReMed Recovery Care Centers v. Township of Willistown*, 36 F.Supp.2d 676, 684–85 (E.D.Pa.1999) (same).

To show that plaintiffs' requested accommodation is unreasonable, defendants must prove that the request either imposes "undue financial and administrative burdens on the defendant, or requires a fundamental alteration in the nature of the program." *Oxford House v. Township of Cherry Hill*, 799 F.Supp. 450, 462 (D.N.J. 1992), *citing Southeastern Community College v. Davis*, 442 U.S. 397, 410–12, 99 S.Ct. 2361, 2369–70, 60 L.Ed.2d 980 (1979).

*See also ReMed Recovery Centers,* 36 F.Supp.2d at 684, *citing Hovsons, Inc. v. Township of Brick,* 89 F.3d 1096, 1104 (3d Cir.1996).

As discussed below, the Court finds that plaintiffs have met their burden of proving a likelihood of success on the merits of their claim that defendants failed to make a reasonable accommodation for plaintiffs' handicapped status. Thus, the court need not address plaintiffs' discriminatory intent and disparate impact claims under the FHA.

Here, rather than argue that plaintiffs' request for an accommodation allowing the group homes to continue operation is unreasonable, defendants contend that they do not need to make a reasonable accommodation for these group homes because these plaintiffs are not protected under the FHA. The court inquired from defendants whether there was anything about this specific type of housing arrangement that made it inappropriate for a multi-family residential zone, or offended the town's zoning principles. Defendants failed to provide any justification which implicated zoning concerns for prohibiting this type of communal living environment. Thus, no evidence has been submitted to show that allowing the homes to continue to operate in the same manner would be an undue financial or administrative burden on the city of New London. Similarly, defendants have not claimed or attempted to prove that to allow these properties to continue operating in precisely the same manner as in previous years would require a "fundamental alteration" of local zoning regulations.[13] In lieu of a persuasive argument under either of these exceptions to the FHA's reasonable accommodation requirements, the city has elected to stand or fall on the question of whether the FHA protects the occupants of the group homes at issue in this case.

Defendants claim that the FHA does not apply because these group homes are not "dwellings" as defined by the Act.[14] [Doc. # 30 at 1.] Defendants rely on several points with respect to this argument. First, defendants claim that, instead of "residences," the three off-campus houses are some other type of facility, such as a rehabilitation or counseling center.[15] [Doc. # 30, at 4.]

In support of this argument, defendants point to a lack of independence in the residents' daily lives, a high degree of structure imposed from external sources, the fact that the homes are not financially self-supporting, and the relationship between the house rules and the treatment each resident receives on the grounds of the Stonington Institute. [Doc. # 30, at 5.] Defendants also note that only Stonington Institute clients reside in the homes, that the Stonington Institute subsidizes the expenses of the OCHs from income derived

13. For a discussion of defendants' concerns about the broader implications of accommodating these plaintiffs, see pages 27–29, infra.

14. The FHA defines a dwelling as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families ...." 42 U.S.C. § 3602(b). The FHA does not define "residence."

15. Defendants also make the argument that the residents of these homes do not constitute a family, and are therefore not protected by the FHA. [Doc. # 18, at 2, 7.] The court does not understand defendants to be making the argument that only certain types of families are protected by the FHA, since "family" is defined by the Act as including a single individual, and the Act protects "one or more families" who live in a dwelling. *See* 42 U.S.C. § 3602. Rather, when defendants argued that these groups "are not a family," the court takes this to refer to their argument that the homes are not residences or dwellings protected under the FHA. The court also notes that defendants recognize that the town's definition of family which limits the number of unrelated persons who could live together, would be a violation of the FHA if used to stop the group homes from operating. *See, e.g., City of Edmonds v. Oxford House, Inc.,* 514 U.S. 725, 738, 115 S.Ct. 1776, 1783, 131 L.Ed.2d 801 (1995); *Oxford House—Evergreen v. City of Plainfield,* 769 F.Supp. 1329 (D.N.J.1991).

**132**

from the partial hospitalization program, that the group homes are essential to the success of the treatment in the partial hospitalization programs, and that the group living environment has therapeutic value for patients during the recovery process. [*See id.* at 4–6.]

Defendants also argue that the group homes are not "dwellings" protected by the FHA because the residents are nothing more than transient guests. [Doc. # 30 at 2.] Since residents are housed in the OCH from one to three months, and on average six weeks, defendants characterize the residents' housing situation as being closer to a hotel or motel stay than to the type of residence the FHA is designed to protect. [*See id.*] Defendants argue that the treatment program requires temporary housing for a temporary period and, once their treatment ends, participants must leave the houses within a short time. [*See id.*] The crux of this claim is that this housing arrangement is a "place of temporary sojourn or transient visit" as opposed to the ordinary meaning of residence and, as such, is not protected as a dwelling under the FHA. *United States v. Hughes Memorial Home,* 396 F.Supp. 544, 548–49 (W.D.Va.1975).[16]

### 1. *Defendants' Argument that the OCH's are Rehabilitative Facilities*

■ Although the court has been unable to find any case which has applied the FHA to a living arrangement similar to the one at issue here, it will not construe the FHA so narrowly as to exclude from its protections group homes for recovering alcohol and drug abusers while those persons are in out-patient treatment. As the Supreme Court has stated, the language of

the FHA is "broad and inclusive" and should be given "a generous construction to implement a policy that Congress considered to be of the highest priority." *Villegas v. Sandy Farms, Inc.,* 929 F.Supp. 1324, 1327 (D.Or.1996) (*citing Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 209, 93 S.Ct. 364, 366–67, 34 L.Ed.2d 415 (1972)). *See also United States v. Hughes Memorial Home,* 396 F.Supp. 544, 548 (W.D.Va.1975); *Remed Recovery Care Centers v. Township of Willistown,* 36 F.Supp.2d 676, 683 (E.D.Pa.1999). After fully reviewing the record and the applicable case law, the Court finds defendants' arguments that the group homes are not residences or that they are not dwellings, and therefore not protected under the FHA, unpersuasive.

The court rejects defendants' contention that the group homes are rehabilitative facilities or counseling centers as opposed to residences.[17] Although the court credits the testimony that the group living arrangement has therapeutic value for recovering addicts during the treatment process,[18] plaintiffs' witnesses specifically refuted any suggestion that treatment or counseling occurred on the OCH premises. The court declines to accept the argument that, because plaintiffs live in an environment that is conducive to the recovery process, that environment changes the nature of the place where they live from a residence to that of a rehabilitative facility. If this were the case, then any group living arrangement that facilitated recovery of a handicapped person would lose the protections of the FHA. *See, e.g., Oxford House, Inc. v. Town of Babylon,* 819 F.Supp. 1179 (E.D.N.Y.1993) (recognizing the benefits of group living arrangements in the treatment of recover-

---

**16.** Most courts use the analysis of the *Hughes* court in defining a residence in its ordinary usage as "a temporary or permanent dwelling place, abode or habitation to which one intends to return as distinguished from the place of temporary sojourn or transient visit." *Id.* at 549.

**17.** Dr. Schottenfeld described a rehabilitation facility as one that is "normally licensed, that's run by professionals." [T. 11/21/00 at 40–41.]

**18.** *See* T. 11/21/00 at 7–8 (Dr. Schottenfeld discussing benefits of living in a group home environment for recovering alcoholics and drug abusers).

ing alcoholics and drug addicts and affording protection under the FHA); *Oxford House, Inc. v. Township of Cherry Hill,* 799 F.Supp. 450 (D.N.J.1992) (same); *North Shore—Chicago Rehabilitation Inc. v. Village of Skokie,* 827 F.Supp. 497 (N.D.Ill.1993) (providing FHA protection to group home for traumatically brain-injured adults); *Martin v. Constance,* 843 F.Supp. 1321 (E.D.Mo.1994) (FHA protection for developmentally disabled adult group home).

Defendants' contention that the highly structured nature of plaintiffs' lives occasioned by plaintiffs' commitment to their treatment program at Stonington Institute changes the nature of the OCH does not compel a finding that the houses are not residential. In different contexts, courts have found that group homes for handicapped individuals which arguably provide more assistance and structure to the lives of the residents are protected by the FHA. For example, the court in *North Shore— Chicago Rehabilitation Inc.* found that a group home planned for persons with traumatic brain injuries was covered under the FHA. 827 F.Supp. 497 (N.D.Ill.1993). The group home in that case was to be staffed with a psychologist and para-professionals 24 hours a day and residents would usually remain at the home for three to eighteen months. *See id.* at 503. The residents would be required to work together to prepare household meals and chores, and regular group discussions would be held regarding problems encountered during daily life. *See id.* Finally, a group counselor would accompany each resident to work and to other activities. *See id. See also Sunrise Dev. Inc. v. Town of Huntington, New York,* 62 F.Supp.2d 762 (E.D.N.Y.1999) (FHA protected assisted living facility which provided help with daily activities such as bathing, dressing, meals, etc.); *Support Ministries for Persons with AIDS, Inc. v. Village of Waterford, New York,* 808 F.Supp. 120 (N.D.N.Y.1992) (group home for HIV infected persons who were unable to live independently, but did not provide on site medical care, covered by the FHA). In each of these situations, the residents had arguably less independence than the residents of the New London group homes and yet, in each case, the FHA protected them. The court notes its concern that a logical extension of defendants' argument would remove FHA protection for other handicapped individuals, whether they lived in a group setting or not, if they needed assistance in their daily activities. This would seem to defeat the purpose of the FHA to remove barriers to housing for those persons who need assistance because of their handicaps.

Here, the Court finds no merit to defendants' argument that the perceived lack of independence and interrelationship between the residents' treatment at Stonington and their daily lives changes the nature of the group homes to rehabilitative facilities. Defendants have failed to appreciate that recovery cannot be imposed on addicts or alcoholics; defendants apparently regard the treatment program run by the Stonington Institute as authoritarian and view the relationship of the participants with staff as custodial. However, the uncontradicted evidence presented on this record is that the residents are willing participants in the Stonington Institute treatment program, and that the structure of their living arrangements during the outpatient phase of their treatment is largely self-imposed and sought by the residents to facilitate their recovery. The court credits the testimony by the two house residents that the house rules are helpful to them, and understands their perplexity at the defendants' suggestion that someone committed to a recovery program would willingly break these rules or be deterred from breaking them only by the threat of eviction from an OCH. [*See, e.g.,* T. 11/20/00 at 117.] As described by the residents, these OCHs give residents the freedom to choose to live by rules that will facilitate recovery, and the support necessary to resist whatever tempts them to backslide. While helpful

to rehabilitation, this kind of organization is not confined to rehabilitative facilities; it is the essence of family life—structure that provides standards of behavior, love and support freely given even in the face of misbehavior, and appreciation of the consequences of failing to live up to expectations.

### 2. *Defendants' Argument that Occupants of the OCH's are Transient Guests*

Defendants correctly note that the FHA does not cover lodgings for transient guests, such as hotels. *See Villegas v. Sandy Farms, Inc.,* 929 F.Supp. 1324, 1327 (D.Or.1996); *Woods v. Foster,* 884 F.Supp. 1169, 1174 (N.D.Ill.1995) (distinguishing between transients as "those who would certainly be moving on to some other residence . . . and inhabitants, those who reside in a particular place, although the length of residence may vary"), *Baxter v. City of Belleville, Ill.,* 720 F.Supp. 720, 731 (S.D.Ill.1989). Defendants point to testimony that residents remain at the homes from one to three months, and only need housing while they are participating in the treatment program in support of their argument.

Many courts have held that the FHA does not require the dwelling to be a permanent residence. *See Lauer Farms, Inc. v. Waushara County Bd. of Adjustment,* 986 F.Supp. 544 (E.D.Wis.1997); *Villegas,* 929 F.Supp. at 1328; *Hernandez v. Ever Fresh Co.,* 923 F.Supp. 1305 (D.Or.1996); *Woods,* 884 F.Supp. at 1173; *Baxter,* 720 F.Supp. at 731; *United States v. Hughes Memorial Home,* 396 F.Supp. 544, 549 (W.D.Va.1975). Courts have found a variety of temporary residences to be dwellings under the FHA. *See, e.g., Turning Point, Inc. v. City of Caldwell,* 74 F.3d 941 (9th Cir.1996) (homeless shelter); *Lauer Farms,* 986 F.Supp. 544 (planned housing for migrant farm workers); *Louisiana Acorn Fair Hous. v. Quarter House,* 952 F.Supp. 352 (E.D.La.1997) (timeshare unit); *Villegas,* 929 F.Supp. 1324 (migrant farm worker cabins); *Hernandez,* 923

F.Supp. 1305 (temporary farm labor camp); *Woods,* 884 F.Supp. 1169 (shelter for homeless women and their children); *Baxter,* 720 F.Supp. 720 (hospice). In making a determination that a temporary residence is a dwelling under the FHA, courts have considered various factors such as the intent of the person to return to the residence, the length of time one expects to remain at that location, the absence of an alternative place of residence, the nature of the occupancy, and the relationship between the resident and the owner of the property. *See Villegas,* 929 F.Supp. at 1328.

The Court finds that the residents of the OCHs located at 29 Brainard Street, 138 Huntington Street, and 15/17 Huntington Street are not transient guests, although these homes provide short term living arrangements. The court credits the testimony that many of the residents have nowhere else to go during this period and are "constructively homeless." [T. 11/20/00 at 13.] As the court in *Woods* held, "[t]he fact that the Plaintiffs have no other place to return to or reside leads the Court to conclude that they reside at the Shelter while participating in the Shelter's program." 884 F.Supp. at 1174. Here, plaintiffs reside at the group homes while participating in the Stonington Institute's treatment program.

The factors mentioned above also persuade the court that the residents are not merely transient guests. Despite defendants' reliance on the length of stay and turnover rate for occupants of the three premises, two current residents testified at the preliminary injunction hearing that they considered the residences to be their homes and, as noted above, they described life there in familial terms. It is the supportive nature of the OCH environment that refutes defendants' argument that the group homes in this case are not dwellings as defined by the FHA because the members are more like transient guests than residents. The residents also testified that, although they thought that they

would probably have to leave the homes when their treatment was finished, neither thought that it was an automatic occurrence and neither had a set date on which he was planning to leave the OCH. [T. 11/20/00 at 119–20, 161.] Based on the testimony of the plaintiffs' witnesses, the nature of the plaintiffs' occupancy "resembles that of a resident far more than that of a hotel guest." *Villegas*, 929 F.Supp. at 1328. *See also Lauer Farms*, 986 F.Supp. at 559 (dwellings provided workers "with a place to return to on a daily basis and a place from which to seek shelter from the elements on a daily and nightly basis for so long as the growing and harvesting season lasted"). Based on all the evidence, this Court finds the group homes located at 29 Brainard Street, 138 Huntington Street, and 15/17 Huntington Street to be dwellings as defined in the FHA.

 Since the court finds the FHA applicable to these three group homes, and defendants have failed to offer any evidence that plaintiffs' requests for an accommodation to allow the continued operation of these group homes are unreasonable, the court is persuaded that plaintiffs have demonstrated a substantial likelihood of success on the merits of their FHA claim. Therefore, plaintiffs' motion for a preliminary injunction must be granted.

Defendants expressed two primary regulatory concerns as part of their opposition to plaintiffs' motion. First, the city is concerned that permitting these specific homes to continue operating would open every zoning district in the city to group homes, regardless of the zoning regulations currently in place. [Doc. # 18, at 10.] Although the court understands this concern, it can only decide the case on the facts before it. Here, the court's ruling is limited to the operation of these three homes for recovering alcohol and substance abusers on these three specific properties, none of which, the court notes, is in a single family residential district of the type in which Oxford-type houses are usually situated.

The New London zoning regulations, like those of many other cities and towns, predate the Fair Housing Act, the Americans with Disabilities Act, and the legislative policy they promote that persons with disabilities have an equal opportunity to participate in the mainstream of community life. They also predate changes in the delivery of rehabilitative and other services, which have dramatically shortened the treatment time spent in in-patient medical and rehabilitative facilities, and have increased the need for "step-down" and other living arrangements which complement out-patient treatment models. While New London has approved locations for several Oxford-type houses since the filing of this lawsuit, these approvals have apparently been granted on an ad hoc basis rather than as part of a comprehensive determination that group homes can be appropriately regulated, or that different types of group homes might require different types of regulation. As other municipalities have successfully adopted ordinances regulating group homes,[19] the court declines to accept the assertion that an injunction against the enforcement of cease and desist orders for these three

---

**19.** Indeed, one of the accommodations sought by Stonington Institute was a proposed group home ordinance. *See supra* text accompanying note 8. For examples of other group home regulations that have been upheld by the courts see: *Forest City Daly Hous., Inc. v. Town of North Hempstead,* 175 F.3d 144, 152 (2d Cir.1999); *Bangerter v. Orem City Corp.,* 46 F.3d 1491, 1503–04 (10th Cir.1995) (FHA permits "reasonable restrictions on the terms or conditions of housing when justified by public safety concerns ...," but "cannot be based on blanket stereotypes about the handicapped...."); *Means v. City of Dayton,* 111 F.Supp.2d 969 (S.D.Ohio 2000) (allowing city to impose facially neutral conditions upon residential care facility); *Familystyle of St. Paul, Inc. v. City of St. Paul, Minnesota,* 728 F.Supp. 1396 (D.Minn.1990) (upholding zoning ordinance limiting placement of homes for persons with mental handicaps).

locations will necessarily lead to zoning anarchy in New London.

A second concern raised by the defendants was the suggestion that the for-profit status of the Stonington Institute precludes the protection of its clients under the Fair Housing Act, perhaps by converting the OCHs to the equivalent of business uses in residential zones. However, the cease and desist orders were not based on this distinction,[20] the ZEO did not articulate any justification for treating group homes owned or operated by for-profit organizations differently than not-for-profit organizations,[21] and there was no evidence presented from which the parties could argue or the court could conclude that the for-profit status of Stonington Institute affects in any way the operation of the three properties at issue. In the absence of any such justification, the court declines to withhold the protections of the Fair Housing Act from people who seek out-patient treatment in programs run by for-profit agencies.

*CONCLUSION*

For the reasons set forth in this ruling, **plaintiffs' Motion for Preliminary Injunction [Doc. # 8], is GRANTED in part and DENIED in part.** Defendants are enjoined from enforcing the outstanding cease and desist orders for 29 Brainard Street, 138 Huntington Street, or 15/17 Huntington Street until the resolution of this case or further order of the court.

---

**20.** The cease and desist orders were premised on the assumption that the group homes were rehabilitative facilities. However, during the preliminary injunction hearing, defendants argued that the properties were rehabilitative facilities, run by a for-profit organization, and were therefore commercial enterprises not protected by the FHA.

**21.** The position taken by New London is that no group homes are allowed by its zoning regulations in any district; and that only Oxford-type houses (that is, houses matching the description of Oxford houses in controlling caselaw) must be permitted because the courts require it.