# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-2249

_____

Northshore Mining Company

*Petitioner*

v.

Secretary of Labor; Mine Safety and Health Administration; Federal Mine Safety
and Health Review Commission

*Respondent*s

_____

Petition for Review of an Order of the
Federal Mine Safety and Health Review Commission

_____

Submitted: November 13, 2012
Filed: March 8, 2013

_____

Before SMITH, BEAM, and GRUENDER, Circuit Judges.

_____

BEAM, Circuit Judge.

Northshore Mining Company (Northshore) petitions for review of a final
decision of the Federal Mine Safety and Health Review Commission (Commission)
affirming a citation by the Secretary of Labor's Mine Safety and Health
Administration (hereinafter Secretary or MSHA) charging a violation of the Federal
Mine Safety and Health Act of 1977 (Mine Act), 30 U.S.C. §§ 801 et seq. Because

we conclude that MSHA erred in relying upon 30 C.F.R. § 56.12016, we vacate the Commission's decision and set aside the citation.

## I. BACKGROUND

This case arises under the Mine Act, wherein the Secretary of Labor sets mandatory safety and health standards for coal and other mines in order to reduce and, ideally, eliminate accidents, injuries and fatalities. 30 U.S.C. § 811. Representatives of the Secretary, in this case from MSHA, inspect mines to determine whether the conditions and practices they encounter comport with established standards. Id. § 813. The Mine Act provides that the Secretary may issue citations and orders for violations of the Mine Act or any rule, order, or regulation promulgated thereunder. Id. § 814. A mine operator can contest a citation or order issued under the Mine Act, as Northshore did here, before the Commission, an independent adjudicatory body that provides administrative hearings and appellate review. Id. §§ 815(d), 823. After an order is contested, an Administrative Law Judge (ALJ) appointed by the Commission conducts an administrative hearing and renders a decision. Id. § 823(d)(1). An aggrieved party may seek discretionary review of this decision before the full Commission. Id. § 823(d)(2)(A)(i). If the Commission declines to exercise such authority, as it did here, the ALJ's decision becomes the Commission's final decision. Id. § 823(d)(1). That decision is appealable to a United States Court of Appeals. Id. § 816(a)(1).

In January 2010, an inspector for MSHA visited Northshore's surface mine in St. Louis County, Minnesota. During his visits, the inspector observed Northshore's operation of a P&H Model 2800XPC Electric Cable Shovel–a mammoth, sophisticated piece of equipment (approximately fifty-five to sixty feet in height) used for mining. On January 19, 2010, the inspector issued a citation against Northshore for an alleged violation of 30 C.F.R. § 56.12016. The citation described the violative condition as follows:

Company #103, P&H Model 2800 Electric Cable Shovel: On 1/11/10 a bull gang mechanic was observed working on the "Dutchman" portion of the shovel bucket. A spot-check of the shovel lock-out indicated that he had locked out the "control supply circuit breaker" and the "relay supply circuit breaker" as per company procedure. Subsequent investigation revealed that only control power was de-energized and locked out versus main power. This condition exposed personnel to moving machine hazards. Company personnel involved in developing this procedure, reportedly were un-aware of the hazard of locking out only control power. This company shovel lockout procedure has reportedly been in effect for about 1 year.

The "dutchman" referenced in the citation is the mechanism that permits the shovel bottom, or "dipper door," to open and dump material. Maintenance on the shovel bucket may occur three times a day, or ten to twenty times a week. As for the procedure employed by Northshore during the maintenance work at issue, MSHA took the position that the lockout for power to the main transformer must be done at the knife switches for the main transformer and not at the circuit breakers for the main transformer, as Northshore's method proscribed. As noted in its text, MSHA issued the citation because of a concern regarding hazards created by mechanical movement of the shovel.

Northshore challenged the citation. As relevant here, the ALJ rejected Northshore's arguments and held that Northshore's method of opening and locking/tagging out of circuit breakers, rather than opening and locking/tagging out the knife switches as insisted on by MSHA, violated 30 C.F.R. § 56.12016. The parties also challenged whether the cited regulation covered the violative condition sought to be abated by the inspector in the citation–i.e., whether § 56.12016 was drafted to abate mechanical movement at all. On that issue, the ALJ held that 30

-3-

C.F.R. § 56.12016 and 30 C.F.R. § 56.14105[1] (the regulation Northshore claimed was more suited to the citation conditions, if any violations existed) are not mutually exclusive and that MSHA did not err in proceeding under the former regulation. The Commission denied discretionary review. Northshore petitions for review, seeking reversal of the final decision.

## II.    DISCUSSION

This dispute involves the interpretation of MSHA regulations, a matter of law that we review de novo. Pattison Sand Co. v. Fed. Mine Safety and Health Review Comm'n, 688 F.3d 507, 512 (8th Cir. 2012). "When Congress has delegated authority to an administrative agency to interpret and implement a federal statute, we give the agency's interpretation deference pursuant to Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)." Beeler v. Astrue, 651 F.3d 954, 959, 960 (8th Cir. 2011) (reviewing both an agency's interpretation of its own regulations and additionally whether the regulations at issue were based on a permissible construction of the relevant statute and finding "no latent ambiguity" in the former), cert. denied, 132 S. Ct. 2679 (2012). In the usual review, we are guided by the maxim that where "Congress has not 'directly spoken to the precise question at issue,' we must sustain the Secretary's approach so long as it is 'based on a permissible construction of the statute.'" Auer v. Robbins, 519 U.S. 452, 457 (1997) (quoting Chevron, 467 U.S. at 842-43)). But, to be accurate, the parties do not challenge the meaning of the Mine Act's statutory language here, nor whether MSHA's regulations are a reasonable interpretation of the enacted statute, both of which considerations directly invoke the Chevron rubric. Rather, we are only faced with reviewing MSHA's interpretation of its own regulatory language, including the

---

[1]Section 56.14105 reads, in relevant part: "Repairs or maintenance of machinery or equipment shall be performed only after the power is off, and the machinery or equipment blocked against hazardous motion."

-4-

force and reach of the language itself, as promulgated by the Secretary in the first instance under a general congressional charge in the Mine Act.[2] While this means that we do not concern ourselves with the interpretation of the language in the Mine Act, it ultimately changes our analysis only slightly.

At least as they are relevant to the instant analysis, the facts of this case are not in dispute. Nor do the parties dispute that the inspector's concern underlying the issued citation was hazards created by mechanical movement of the shovel. Thus, Northshore's challenge on appeal is twofold. First, Northshore challenges whether § 56.12016 was the appropriate regulation to apply in these circumstances. Alternatively, assuming that the Secretary cited the appropriate regulation, Northshore claims that the procedure it employed complied with the standard set out in the first sentence of § 56.12016. If we agree that the Secretary erred in issuing the citation under § 56.12016 we need not address Northshore's second claim. We hold that MSHA erred in relying upon 30 C.F.R. § 56.12016 under the circumstances at issue here.

When reviewing a challenged interpretation of regulatory language, the Secretary's interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulation." Auer, 519 U.S. at 461 (internal quotation omitted). "Nonetheless, 'Auer deference is warranted only when the language of the regulation is ambiguous.'" Fast v. Applebee's Int'l, Inc., 638 F.3d 872, 878 (8th Cir. 2011) (quoting Christensen v. Harris County, 529 U.S. 576, 588 (2000)), cert. denied, 132 S. Ct. 1094 (2012). The starting point in this case, then, is determining the plain meaning of § 56.12016.

---

[2]As previously stated, the Secretary promulgated this regulatory scheme under the Mine Act's general command to "develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines." 30 U.S.C. § 811(a).

The citation at issue charged Northshore of violating § 56.12016, which provides in part:

> Electrically powered equipment shall be deenergized before mechanical work is done on such equipment. Power switches shall be locked out or other measures taken which shall prevent the equipment from being energized without the knowledge of the individuals working on it.

The question now before us is whether § 56.12016 addresses the violative condition sought to be abated by this citation. The text of § 56.12016 is ambiguous as to the crucial interpretive question regarding whether the section applies to abate the hazard of mechanical movement. In light of this ambiguity, we consider its title, as well as its context, or placement, in the subchapter and regulatory scheme as a whole to discern the reach and application of this regulation. United States v. May, 535 F.3d 912, 918 (8th Cir. 2008) ("At the very least, [an additional possible meaning of the statutory language] creates an ambiguity, and triggers the permissible reference to the title."), abrogated on other grounds by Reynolds v. United States, 132 S. Ct. 975 (2012). To resolve the ambiguity, in addition to looking to the agency's own interpretation of the regulation for guidance, we utilize established rules of statutory construction. See Chase Bank USA v. McCoy, 131 S. Ct. 871, 878-80 (2011) (applying rules of statutory construction and finding an ambiguity in a regulation).

Reviewing the placement of the regulation at issue within the regulatory scheme itself is instructive. Doing so assists in the basic determination as to whether the agency's interpretation is inconsistent or plainly erroneous. Auer, 519 U.S. at 462 (explaining the importance of ensuring that the agency's interpretation, if it is worthy of deference, must not be a post hoc rationalization advanced by the agency seeking to defend past agency action against attack, and should represent an agency's fair and considered judgment on the matter in question); Advanta USA, Inc. v. Chao, 350 F.3d 726, 729-31 (8th Cir. 2003) (construing an ambiguous regulation and holding that,

-6-

when placed in context using the regulation's preamble, the agency's interpretation of its regulation was unworthy of deference).

Certainly, the title or heading of a section or other such organization of regulatory language cannot be used to alter the meaning of a regulation, find a regulation ambiguous, or limit the plain meaning of its text. Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co., 331 U.S. 519, 529 (1947). Yet such aids *are* of use to shed light on an ambiguity in the regulation under review. Id. "They are but tools available for the resolution of a doubt," not inroads to "undo or limit that which the text makes plain." Id.; see also Almendarez-Torres v. United States, 523 U.S. 224, 234 (1998) (noting that "the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute") (internal quotation omitted)).

Regulatory language "cannot be construed in a vacuum." Davis v. Michigan Dep't of the Treasury, 489 U.S. 803, 809 (1989). "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Id. (applying established rules of statutory construction to discern the plain language of the statute at issue). Thus, while not dispositive, the placement of a provision in a particular subchapter, for example, suggests that its terms should be interpreted consistently with its context. See, e.g., Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc., 554 U.S. 33, 46-52 (2008) (analyzing the statutory text at issue according to its natural language, the context of its placement within the United States Code, and applicable substantive canons of construction; but refraining from actually finding the statutory language at issue ambiguous because under all applicable interpretations, one party's interpretation prevailed); Advanta, 350 F.3d at 728-29 (utilizing rules of statutory construction with equal force to discern an issue of regulatory construction).

Placing § 56.12016 in context resolves any ambiguity raised by this action and leads to the conclusion that MSHA's interpretation of the regulation's reach in this case is inconsistent with its text and placement in the regulatory scheme. See Pattison Sand, 688 F.3d at 513 (looking to the Secretary's position before the Commission to determine whether, in context, her proposed interpretation of the ambiguous regulatory language was reasonable). The overall thrust of § 56.12016 is unmistakable when placed in context: it is written to abate the risk of electrocution. Section 56.12016 applies to the hazard of electrical shock, not the injuries sought to be avoided here from mechanical movement. Phelps Dodge Corp. v. Fed. Mine Safety and Health Review Comm'n, 681 F.2d 1189 (9th Cir. 1982). We thus disagree with MSHA's conclusion that § 56.12016 was designed to target both mechanical movement and electrocution.

We are not alone in this conclusion. In Phelps Dodge, the Ninth Circuit invalidated a civil penalty issued under the Mine Act pursuant to the regulation at issue here. Id. at 1193. The fine was issued for hazards caused by rocks and stones clogging a drop chute, which necessitated the use of manual labor to clear the chute. Id. at 1191. The cited corporation, as here, challenged whether MSHA properly applied the regulation in that particular factual setting. Id. at 1191-92. The court held that MSHA's regulation was enacted "to protect workers from the hazards of electrical shock, not such hazards as may attend removal of rocks from the chute." Id. at 1192. In fact, the court noted the regulation was placed under the heading "Electricity" and "sandwiched between regulations whose purpose is manifestly to prevent the accidental electrocution of mine workers." Id.

The regulations in subpart K, of which § 56.12016 is a part, are directed to abatement of the danger of electrical shock. "They simply do not address the hazards arising from the accidental movement of electrical equipment while mechanical work is being done thereon." Id. In a footnote, the Ninth Circuit surmised that interestingly, another regulation more clearly addressed the problem of accidental

-8-

equipment start-ups. Id. at 1192 n.4. Likewise, Northshore advances that § 56.14105 is the particular regulation drafted to abate mechanical movement and could have more appropriately been cited by the inspector.[3] Utilizing the definition of the word "deenergize" contained in § 56.12016, read in conjunction with the other regulations of the subpart, the Phelps Dodge court concluded that the cited regulation's main concern was protection from electrical shock. Id. at 1192-93.

Since Phelps Dodge, the Commission has discussed its holding in various circumstances, but the Secretary has not amended § 56.12016 to address the position taken by the Ninth Circuit.[4] "The Supreme Court has repeatedly held that agencies may validly amend regulations to respond to adverse judicial decisions, or for other reasons, so long as the amended regulation is a permissible interpretation of the statute." Mayo Found. for Med. Educ. and Research v. United States, 568 F.3d 675, 683 (8th Cir. 2009), aff'd, 131 S. Ct. 704 (2011). Thus, while MSHA's failure to take the opportunity post-Phelps Dodge to clarify the issue is certainly not dispositive, the fact that it has not done so is at the very least relevant to the query, especially given the context of § 56.12016. Id. In this case, MSHA has not changed the regulation

_____

[3]We do not weigh in on this discussion, however, as suggesting an alternate regulation under which to proceed is a matter not before us, nor is it a question we are equipped to address in the first instance.

[4]See e.g., Empire Iron Mining P'ship, 29 FMSHRC 999 (2007) (discussing Phelps Dodge and the viability of citing alternative violations and noting in a footnote its agreement with the dissenting judge in Phelps Dodge); Suburban Sand & Gravel, 28 FMSHRC 359 (2006) (reversing a citation issued under § 56.12016 because there was no risk that anyone would be exposed to an electrical hazard while doing the work in question); Leo Journagan Constr. Co., Inc., 18 FMSHRC 892 (1996) (favorably discussing the dissenting opinion in Phelps Dodge); Arkhola Sand & Gravel, Inc., 17 FMSHRC 593, 597 (1995) (holding that § 56.12016 was improperly cited by the inspector because "[t]he basic purpose of section 56.12016, which is contained in Subpart K under the heading 'electricity,' is to protect miners from electrical hazards rather than mechanical hazards.").

even when it had the opportunity to do so, despite a longstanding judicial interpretation and ongoing discussion in administrative cases regarding the regulation's applicability in these circumstances. This further convinces us that MSHA's interpretation is unworthy of deference in this instance.

## III. CONCLUSION

For the reasons stated herein, we vacate the Commission's decision and set aside the citation.

_____