**UNITED STATES of America,**
**Plaintiff,**

v.

**UNIVERSITY OF NEBRASKA AT KEARNEY, et al., Defendants.**

**No. 4:11–CV–3209.**

United States District Court,
D. Nebraska.

April 19, 2013.

Colleen M. Melody, Mary J. Hahn, Washington, DC, Laurie A. Kelly, U.S. Attorney's Office, Omaha, NE, for Plaintiff.

Alison A. Basye, University of Nebraska, Lincoln, Anthony D. Todero, Scott P. Moore, Baird, Holm Law Firm, Omaha, NE, for Defendants.

## MEMORANDUM AND ORDER

JOHN M. GERRARD, District Judge.

The Fair Housing Act, 42 U.S.C. § 3601 *et seq.* (FHA), generally makes it unlawful to deny a "dwelling" to a person based on the person's handicap. *See* 42 U.S.C. § 3604(f). The question presented is whether student housing at the University of Nebraska–Kearney (UNK) is a "dwelling" within the meaning of the FHA. The Court concludes that it is, making the anti-discrimination provisions of the FHA applicable. Accordingly, the Court will deny the defendants' motion for summary judgment and grant the United States' motion.

## BACKGROUND

The underlying dispute here involves a service animal. The United States, as plaintiff, is suing on behalf of Brittany Hamilton, who has been diagnosed with depression and anxiety. Filing 1 at 1, 3, 7. A therapy dog has been prescribed for Hamilton and is trained to respond to her anxiety attacks. Filing 1 at 7. After Hamilton enrolled to attend UNK for the fall semester in 2010, she signed a lease to live at University Heights, one of UNK's student housing facilities. Filing 1 at 7. But Hamilton's requests to live with her dog were denied, based on UNK's no-pets policy for student housing. Filing 1 at 4, 7. After a few weeks, Hamilton withdrew from her classes and moved out of University Heights. Filing 1 at 14.

UNK is a four-year university in the University of Nebraska system, and it provides student housing for approximately 2,280 students annually.[1] Filing 41 at 3, 5.

---

1. Pursuant to NECivR 56. 1, a party moving for summary judgment must include in its brief a statement of material facts about which the movant contends there is no dispute, and the party opposing summary judgment must include in its brief a concise response to that statement of facts, noting any disagreement. Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response. NECivR 56.1(b)(1). Except where noted, the facts stated in this Memorandum and Order are contained in one of the parties' statements of fact and not controverted by the opposing party. While the parties have the usual grievances about one another's assertions, there appears to be

There are a variety of available living arrangements, including the sort of on-campus dormitory-style residence halls most commonly associated with university housing, but also including suites, fraternities and sororities, and private apartments. Filing 41 at 5. During the 2010–11 academic year, UNK charged between $3,569 and $4,214 per semester for room and board. Filing 41 at 5.

UNK students who are under the age of 19 on the first day of the semester are required to live in university housing, subject to limited exceptions. Filing 39 at 3. According to UNK, living in university housing promotes a student's educational experience. Filing 39 at 3. Students do not get to choose their own rooms; instead, students elect a building preference and UNK assigns them to a room. Filing 39 at 4. Most UNK students living on campus list a "permanent address" different from their campus address. Filing 39 at 4. Students living in university housing (except for students living in University Heights) must also purchase a meal plan. Filing 39 at 5. Most (but not all) university housing closes during academic breaks: Thanksgiving, winter, and spring. Filing 39 at 5. University Heights and another housing facility are open for students who remain during the summer semester, while other university housing facilities are used as lodging for camps and conferences UNK hosts. Filing 39 at 5.

The housing unit most particularly at issue here, University Heights, is located about a mile off campus. Filing 41 at 9. UNK describes it as "apartment-style living" for "families and single students above the age of 21 who are currently enrolled as full-time students at UNK."[2] Filings 41 at 9; 49–1 at 20. University Heights contains one-bedroom and efficiency apartments that, like many commercial apartments, are unfurnished except for a stove and refrigerator. Filing 41 at 9. Students are responsible for bringing their own furniture and for cleaning and maintaining their apartments. Filing 41 at 9. Utilities are provided by UNK except for telephone and Internet access. Filing 49–1 at 37. Rent at University Heights as of July 1, 2010, was $390 per month for a one-bedroom apartment and $320 per month for an efficiency apartment. Filings 41 at 10; 44–2 at 5. Students living in University Heights are permitted to stay in their apartments during the summer semester (and, presumably, during other academic breaks) if they maintain a sufficient courseload *or* if they are registered to be full-time students for the following fall semester. Filing 49–1 at 34.

The United States has brought the present case on Hamilton's behalf, alleging that UNK's conduct in denying Hamilton's request for an accommodation violated the FHA. Filing 1 at 1, 15–17. The defendants are UNK, the Board of Regents of the University of Nebraska, and various UNK officials (collectively, UNK). Filing 1 at 2–3. The present cross-motions for partial summary judgment (filings 37 and

very little meaningful disagreement about the facts material to the issue presented by these motions.

2. The record contains many of UNK's publications describing its housing options. UNK often describes its housing with terms such as "your home away from home." Filing 49–1 at 3. While that is not irrelevant, the Court has focused more on evidence of the actual student experience, and less on the promotional material produced by UNK. That material is best understood as an effort to foster a spirit of community, and to appeal to students and parents who may have concerns about what is probably, for many students, their first experience of living outside the family residence. The Court has been careful not to read too much into it; the reality of student living is far more important than UNK's marketing.

40) are directed at the narrow issue of whether UNK's student housing facilities are "dwellings" covered by the FHA.

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir.2011) (en banc). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Id.*

Rule 56 also allows the Court to grant summary judgment as to some issues but not as to others. *See* Fed.R.Civ.P. 56(a). Upon doing so, the Court may "enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute," and thereby treat such a fact "as established in the case." Fed.R.Civ.P. 56(g). The cross-motions for summary judgment before the Court present only one issue: whether UNK's student housing facilities are "dwellings" within the meaning of the FHA.

## ANALYSIS

■ The various antidiscrimination provisions of the FHA generally proscribe discrimination with respect to "a dwelling." " 'Dwelling' means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families...."[3] 42 U.S.C. § 3602(b). But the FHA does not define a "residence." So, in order to determine whether student housing is a "dwelling" covered by the FHA, the Court must determine whether it is occupied as, or designed or intended for occupancy as, a residence. In making that determination, the Court is guided by the principle that the FHA implements a policy to which Congress has accorded the highest national priority, and it is to be construed liberally in accordance with that purpose. *United States v. Hughes Mem'l Home,* 396 F.Supp. 544, 548 (W.D.Va.1975) (citing *Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 211–12, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972)); *see also Lakeside Resort Enters., LP v. Bd. of Supervisors of Palmyra Twp.,* 455 F.3d 154, 156 (3d Cir.2006) (courts are to give generous construction to FHA's broad and inclusive language).

■ "Residence" is not defined by the FHA. When a word is not defined by statute, a court normally construes it in accord with its ordinary or natural meaning. *United States v. Jungers,* 702 F.3d 1066, 1071 (8th Cir.2013) (citing *Smith v. United States,* 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993)). Courts have held that the ordinary meaning of the word "residence," in this context, is "a temporary or permanent dwelling place, abode, or habitation to which one intends to return as distinguished from a place of temporary sojourn or transient visit." *Schwarz v. City of Treasure Island,* 544 F.3d 1201, 1214 (11th Cir.2008); *Lakeside Resort Enters.,* 455 F.3d at 157; *see also, e.g., Hughes Mem'l Home,* 396 F.Supp. at 549.[4] "In other words ... the house,

---

**3.** " 'Family' includes a single individual." 42 U.S.C. § 3602(c).

**4.** The Eighth Circuit has not spoken to this issue. But this definition was first promulgated in *Hughes Mem'l Home* nearly 40 years ago, and it has been consistently applied by

apartment, condominium, or co-op that you live in is a 'residence,' but the hotel you stay in while vacationing at Disney World is not." *Schwarz,* 544 F.3d at 1214.

■ Superficially, UNK's student housing (and particularly University Heights) appears to be residential: students living in those facilities eat their meals, wash their laundry, do their schoolwork, socialize, and sleep there, just as people ordinarily do in the places they call home. And that view finds support in caselaw: boarding schools, in particular, have been found to be "dwellings" within the meaning of the FHA. *Franchi v. New Hampton Sch.,* 656 F.Supp.2d 252, 260 (D.N.H.2009); *United States v. Mass. Indus. Fin. Agency,* 910 F.Supp. 21, 26 n. 2 (D.Mass.1996); cf. *Hughes Mem'l Home,* 396 F.Supp. at 549 (children's home).

UNK argues that its students are "transient" visitors, and that they do not have an "intent to return" to university housing. Filing 39 at 9. UNK points out that most students leave university housing after their first year (when many are no longer required to live there), and that most on-campus students identify "permanent" addresses elsewhere.[5] Filing 39 at 14–15. But UNK's argument overlooks the fact that a "residence" may be "temporary *or* permanent[,]" see *Schwarz,* 544 F.3d at 1214 (emphasis supplied), without becoming "transient." To hold otherwise would effectively mean that any residence ceases to be a "dwelling" when the resident intends, at some point, to leave: a conclusion that could, for instance, remove any residential premises leased for a finite term

from the scope of the FHA. *See Cohen v. Twp. of Cheltenham,* 174 F.Supp.2d 307, 323 (E.D.Pa.2001). That result is simply unsupported by the statutory language, not to mention Congressional intent. *See id.* UNK's students obviously do not intend to live in university housing for the rest of their lives. But they do intend to live in university housing for extended periods of time that are roughly comparable to many other residential living situations. And that is all the FHA requires. *See id.*

Instructive in that regard is a series of cases applying the FHA to housing provided for migrant farm workers. Like a university education, temporary farm labor is periodic and roughly seasonal, and like university students, migrant workers may or may not return to the same place season after season, year after year. But courts have consistently held that the quarters provided for those workers by their employers are "dwellings" within the meaning of the FHA. *Lauer Farms, Inc. v. Waushara Cnty. Bd. of Adjust.,* 986 F.Supp. 544 (E.D.Wisc.1997); *Hernandez v. Ever Fresh Co.,* 923 F.Supp. 1305 (D.Or. 1996); *Villegas v. Sandy Farms, Inc.,* 929 F.Supp. 1324 (D.Or.1996). Workers' occupancy of such quarters is temporary, and they may only occupy them while engaged in their employment. But their "permanent residences are far removed from their places of employment … and during the growing season [they] reside at the farm and nowhere else." *Villegas,* 929 F.Supp. at 1328.

Because the cabins are occupied by farmworkers and their families for near-

---

courts since then, suggesting legislative and administrative acquiescence. *See General Dynamics Land Sys. v. Cline,* 540 U.S. 581, 593–94, 124 S.Ct. 1236, 157 L.Ed.2d 1094 (2004).

**5.** Although the record does not directly address this, it would be consistent with the Court's experience that many college students

maintain their "home" address for official purposes until after graduation, and perhaps longer—whether they live on campus or, for instance, rent their own off-campus apartments. The Court is not persuaded that the address students choose to use on their driver's licenses changes the character of their lodgings.

ly five months of the year, the cabins are far more than mere places of temporary sojourn or transient visit. . . . [D]uring the farmworkers' employment by defendant, the cabins are their homes. The nature of the workers' occupancy resembles that of a resident far more than that of a hotel guest. In addition, the nature of the workers' employment relationship with defendant, the fact that workers may only occupy the cabins while employed by defendant, and the fact that the cabins are private accommodations available only to defendant's employees, refute the argument that occupants of the cabins resemble hotel guests.

*Id.* And there is no indication in the FHA that Congress intended to limit its coverage to year-round dwellings, because to do so would create a broad exception that would violate the letter and spirit of the FHA. *Id.* (citing *United States v. Columbus Country Club*, 915 F.2d 877, 881 (3d Cir.1990)). While the workers may have had other places to return to for the rest of the year, that does not mean that the migrant worker quarters were not also places to which they planned to return: "[t]o the contrary, they would have returned to those structures every night for four to five months."[6] *Lauer Farms*, 986 F.Supp. at 559.

Similarly, in finding that halfway houses for recovering substance abusers were "dwellings" within the meaning of the FHA, the Eleventh Circuit pointed out that while the patients were admittedly living there temporarily, their stays were far longer than that of the average hotel guest—6 to 10 weeks, on average, and some as long as 5 months. *Schwarz*, 544 F.3d at 1215. And the halfway houses were more like homes "because they have common living areas, such as kitchens and living rooms, where residents can socialize like a family." *Id.* at 1215–16.

[T]he residents treat the halfway houses more like homes than hotels: they sign month-long leases for $1,000 to $2,000 per bedroom; they cook their own food; they eat together; they clean and maintain the premises; and they spend their free time together. Again, these activities suggest that the halfway houses function more like residential homes than hotels.

*Id.* at 1216; *see also Lakeside Resort Enters.*, 455 F.3d at 159–60. The same can easily be said of university housing, particularly at University Heights. University Heights, in particular, resembles nothing more than an apartment building, which would clearly be covered by the FHA. *See Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1036 (2d Cir.1979). Simply put, students live in university housing for a significant time period, and while they do, they treat it like home. *See, Lakeside Resort Enters.*, 455 F.3d at 159–60; *Cohen*, 174 F.Supp.2d at 323.

UNK urges a different comparison. UNK points out that many first-year students are required to live in university housing. Filing 39 at 16. They are assigned rooms and perhaps roommates, and while they live there they are subject to more onerous rules and restrictions than are normally associated with residential housing. Filing 39 at 16. And UNK argues that the purpose of university housing is educational, rather than to provide a residence. Filing 39 at 16. Based on these facts, UNK makes the unflattering association between university housing and

---

**6.** The Court also notes that University Heights' residents are far less "seasonal" than students in other university housing—while residence is still conditioned on enrollment, the periods of residency for University Heights are substantially indistinguishable from (if perhaps a bit shorter than) the lease terms of an ordinary residential apartment.

jail, which has been held not to be a dwelling within the meaning of the FHA. Filing 39 at 16. *See Garcia v. Condarco,* 114 F.Supp.2d 1158 (D.N.M.2000). But the Court is not convinced that the comparison is apt.

To begin with, while UNK is free to contend that university housing serves pedagogical ends, the primary way in which student housing furthers the educational mission of a college or university is by providing students with a place to live while they pursue their education. Jail, on the other hand, does not exist so that prisoners have a place to stay while they participate in prison educational programs. As the *Garcia* court pointed out, a jail is not designed or intended for occupancy *as a residence;* "[r]ather, the primary purpose of a jail is to provide just punishment, adequate deterrence, protection of the public, and correctional treatment." 114 F.Supp.2d at 1161. And more importantly, the court in *Garcia* reasoned that the FHA's policy was to provide for fair housing, which depended on freedom of choice—a purpose that has no application in the prison context. *Id.* at 1162. While UNK contends that some first-year students are assigned to university housing, they still choose to enroll at UNK, meaning that they have a freedom of choice that is quite unlike going to jail.

And even assuming that UNK uses the environment of university housing to further educational goals (and the Court sees no reason to doubt that), it does not change the character of the dwelling. It is not clear how many of the restrictions relied upon by UNK are imposed on students living in University Heights, as opposed to other university housing facilities. But more fundamentally, the Court rejects the argument that because students live in an environment conducive to the educational process, it changes the nature of the place where they live from a residence

to something akin to a correctional center. *See Conn. Hosp. v. City of New London,* 129 F.Supp.2d 123, 132 (D.Conn.2001). The *Conn. Hosp.* court rejected a similar argument in finding that the group homes of a substance abuse treatment center were "dwellings" within the meaning of the FHA. *See id.* The defendants in that case argued that the highly structured nature of the residents' lives compelled a finding that the homes were no longer residential. *Id.* at 133. But the court found

> no merit to defendants' argument that the perceived lack of independence and interrelationship between the residents' treatment ... and their daily lives changes the nature of the group homes to rehabilitative facilities. Defendants ... apparently regard the treatment program ... as authoritarian and view the relationship of the participants with staff as custodial. However, the uncontradicted evidence ... is that the residents are willing participants in the ... program, and that the structure of their living arrangements during the outpatient phase of their treatment is largely self-imposed and sought by the residents to facilitate their recovery.... As described by the residents, these [homes] give residents the freedom to choose to live by rules that will facilitate recovery, and the support necessary to resist whatever tempts them to backslide. While helpful to rehabilitation, this kind of organization is not confined to rehabilitative facilities; it is the essence of family life—structure that provides standards of behavior, love and support freely given even in the face of misbehavior, and appreciation of the consequences of failing to live up to expectations.

*Id.* at 133–34. UNK's argument is based on a similar misapprehension: that rules make a place less "residential." While university housing may have more rules than the average off-campus apartment, it

is no more restrictive than many other places that people call home. (Many students, in fact, may be less restricted in university housing than in their parental residences.)

The Court's conclusion is buttressed by the regulations promulgated by the Department of Housing and Urban Development (HUD) to implement the FHA. HUD has simply adopted the definition of "dwelling" set forth in the FHA. *See* 24 C.F.R. § 100.20. And HUD has not defined "residence." But as relevant to disability discrimination, HUD has defined "dwelling unit" as

> a single unit of residence for a family or one or more persons. Examples of dwelling units include: a single family home; an apartment unit within an apartment building; and in other types of dwellings in which sleeping accommodations are provided but toileting or cooking facilities are shared by occupants of more than one room or portion of the dwelling, rooms in which people sleep. *Examples of the latter include dormitory rooms* and sleeping accommodations in shelters intended for occupancy as a residence for homeless persons.

24 C.F.R. § 100.201 (emphasis supplied).

And HUD's interpretation of the FHA commands considerable deference. When Congress has delegated authority to an administrative agency to interpret and implement a federal statute, and the agency interpretation claiming deference was promulgated in the exercise of that authority, the Court gives the agency's interpretation deference pursuant to *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Beeler v. Astrue,* 651 F.3d 954, 959 (8th Cir.2011); *see also Northshore Min-*

*ing Co. v. Sec'y of Labor,* 709 F.3d 706, 708 (8th Cir.2013). Under *Chevron,* the agency's view governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed most reasonable by the courts. *Beeler,* 651 F.3d at 959. The Court is guided by the maxim that where Congress has not directly spoken to the precise question at issue, it must sustain the agency's approach so long as it is based on a permissible construction of the statute. *Northshore Mining,* 709 F.3d at 708. HUD is the agency charged with administering the FHA, and its interpretation is entitled to deference here. *See, Meyer v. Holley,* 537 U.S. 280, 287–88, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003); *Gladstone Realtors v. Vill. of Bellwood,* 441 U.S. 91, 107, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979).

■ UNK tries to avoid the implications of § 100.201 in two ways. First, UNK argues that the regulation is ambiguous because it does not define "residence." Filing 39 at 21. UNK contends that while § 100.201 defines "dwelling unit," it does not "provide guidance as to whether a particular building or facility is a 'dwelling.'" Filing 39 at 23. In general, that might be the case, but the specific use of the word "dormitory" makes it useful here. If a "dwelling unit" is a unit of residence, then a building containing a "dwelling unit" must be a building designed or intended, at least in part, for occupancy as a residence.[7] *See Schwarz,* 544 F.3d at 1214. And if a dormitory room is an example of a dwelling unit, then the syllogism is complete: a building containing dormitory rooms, *i.e.,* a dormitory, must be a dwelling within the meaning of the FHA.

---

**7.** A building can be part-dwelling: for instance, when a mixed-use building contains both residential and commercial units, the residential unit may be subject to the FHA.

*See, e.g., Home Quest Mortg. LLC v. Am. Family Mut. Ins. Co.,* 340 F.Supp.2d 1177, 1184–85 (D.Kan.2004). But that distinction is not important here.

Second, UNK argues that a "dormitory" is simply defined as "a room for sleeping." Filing 39 at 24 (citing Merriam–Webster Dictionary, http://www.merriam-webster.com/dictionary/dormitory (last visited Nov. 1, 2012)). "Dormitories, therefore," UNK argues, "could include prisons, military barracks, homeless shelters, camps, and numerous other communal lodging facilities." Filing 39 at 24. UNK's point is not entirely clear: a more expansive definition of "dormitory"—and thereby, of "dwelling unit" and "dwelling"—hardly serves its interests. But the Court disagrees with UNK's premise. The HUD definition explains that a "dormitory" is an example of a type of dwelling "in which sleeping accommodations are provided but toileting or cooking facilities are shared by occupants of more than one room or portion of the dwelling, rooms in which people sleep." § 100.201. That describes the paradigmatical university dormitory, and it is consistent with the definition of "dormitory" that is more appropriate in this context: "a residence hall providing rooms for individuals or for groups usually without private baths." Merriam–Webster Dictionary, http://www.merriam-webster.com/dictionary/dormitory (last visited April 19, 2013); *see also New Oxford American Dictionary* 504 (2d ed. 2005) (defining "dormitory" as "a large bedroom for a number of people in a school or institution" or "a university or college hall of residence or hostel"). It suffices to conclude that HUD's definition of a "dwelling unit" as including a dormitory is compelling authority supporting the conclusion that UNK's housing facilities are "dwellings" within the meaning of the FHA.

UNK offers a few other arguments it says suggest that university housing is not a "dwelling." First, UNK points out that university housing has been exempted from the Nebraska Uniform Residential Landlord and Tenant Act, Neb.Rev.Stat. § 76–1401 *et seq. See* Neb.Rev.Stat. § 76–1408(1) (excluding residence at an institution if incidental to educational service). Filing 39 at 19. But the Court is not persuaded that Nebraska's landlord-tenant law illuminates the meaning of a federal statute. And even if it did, it would cut the other way: the Nebraska Legislature would not have needed to specifically *exclude* educational institutions from the enactment's definition of "dwelling unit" if educational housing was not *included* in the general definition to begin with. *See* Neb.Rev.Stat. § 76–1410(3). The Nebraska statute does not help UNK.

Nor does the Americans with Disabilities Act (ADA). UNK points out that the Department of Justice (DOJ), in promulgating regulations implementing the ADA, decided that the standards applicable to newly constructed educational housing should be those for transient lodging, such as hotels, and not those for residential facilities. *See* Nondiscrimination on the Basis of Disability in State and Local Government Services, 75 Fed.Reg. 56,164, 56,215–16 (Sept. 15, 2010). This, UNK suggests, shows that college students are transients, not residents. Filing 39 at 25. But that oversimplifies the decision that the DOJ made.

Perhaps most importantly, the DOJ was not deciding whether the ADA applied at all—it was determining *how* the ADA should be applied. And in some respects, the ADA compliance standards for transient lodging are *more* onerous than those for residential facilities. For instance, multistory public buildings generally must have elevators, while residential facilities need not. 75 Fed.Reg. at 56,215. And transient lodging must have accessibility features immediately available, while residential facilities may in some instances have those features ready to install as needed. *Id.* But residential facilities require other features that transient lodg-

ings do not, such as more usable kitchens, and residential facilities must have a greater percentage of accessible rooms. *Id.*

The point of all that is to demonstrate that the DOJ's decision was not to assign a heightened or lowered degree of accessibility—it was to determine what *type* of accessibility was most appropriate for the use of the building. The DOJ used transient lodging as the base standard because it was concerned that the residential standards were *insufficient* to protect access to educational programs for students with disabilities. And even then, the DOJ added additional requirements for educational housing, such as the residential facilities standards related to turning spaces and kitchen work surfaces. *Id.* at 56,216. In the end, it suffices to say that the Court finds nothing in the DOJ's rulemaking process that provides any insight into how the Court should apply the well-established standards for determining whether something is a "dwelling" under the FHA.

Finally, UNK argues that Congress did not intend for educational housing to be a "dwelling" because that would alter how colleges and universities operate. Filing 39 at 28. For instance, segregating housing on the basis of gender might be affected. Filing 39 at 29. Essentially, UNK is exhibiting a parade of horribles that could purportedly ensue if UNK is subjected to the FHA.

The Court is not persuaded that UNK's predictions, in their particulars, are realistic. But even if they were, that would not permit the Court to misconstrue the word "dwelling" to avoid them. If the FHA can be read to exclude university housing, then that reading cannot depend on the understanding of the word "dwelling" that UNK urges on the Court. *See Franchi,* 656 F.Supp.2d at 261. If colleges and universities need to be exempted from the scope of the statutory language, they are free to ask Congress to amend the statute, or

petition HUD to promulgate new regulations.

In the meantime, the Court must apply the statute as it is written and has been authoritatively construed by HUD. And based on the statute, UNK's student housing facilities are clearly "dwellings" within the meaning of the FHA. Therefore, UNK's motion for summary judgment on that point will be denied, and the United States' cross-motion will be granted.

IT IS ORDERED:

1. The Plaintiff United States of America's Cross–Motion For Partial Summary Judgment on the Issue of the Fair Housing Act's Application to Universities and Colleges (filing 40) is granted.

2. UNK's Motion for Summary Judgment (filing 37) is denied.

3. It is established, for purposes of this case, that UNK's student housing facilities are "dwellings" within the meaning of the Fair Housing Act.